| | | |
|---|---|---|
| **LINDA SARSOUR**, *et al.*; | ) | |
| | ) | |
| Plaintiffs, | ) | **Case No. 17-cv-00120** |
| | ) | **Hon. Anthony J. Trenga** |
| v. | ) | |
| | ) | |
| **DONALD J. TRUMP**, President of the United | ) | **EXPEDITED HEARING** |
| States of America; in his official capacity, *et al.*; | ) | **REQUESTED** |
| | ) | |
| Defendants. | ) | |

## PLAINTIFFS' EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION

**NOW COME** Plaintiffs Hussam Ayloush, Basim Elkarra, Adam Soltani and John Doe Nos. 2, 3, 5, 6, 7 and 8, for themselves and on behalf of all others similarly situated, by and through their attorneys, Council on American-Islamic Relations ("CAIR"), The Law Office of Gadeir Abbas, and Akeel and Valentine, PLC, and hereby move this Court for an Emergency Temporary Restraining Order and/or Preliminary Injunction pursuant to Fed. R. Civ. P. 65, in the form requested in the Amended Complaint, in order to prevent irreparable injury to Plaintiffs' fundamental rights and interests. In support of their Emergency Motion, Plaintiffs rely on the pleadings, motions, and attached Brief in Support filed concurrently with the Court.

Plaintiffs' counsel have conferred with counsel for Defendants, and they stated that they do not concur with the relief sought.

**WHEREFORE,** for the reasons discussed in the accompanying Brief, Plaintiffs respectfully request this Honorable Court GRANT their Emergency Motion for Temporary Restraining Order and/or Preliminary Injunction, and grant costs, attorneys' fees, and any other relief it deems just and equitable.

i

Respectfully submitted,

THE LAW OFFICE OF GADEIR ABBAS

BY:  /s/ Gadeir Abbas
GADEIR I. ABBAS
Attorney for Plaintiff
1155 F Street NW, Suite 1050
Washington, D.C. 20004
Telephone: (720) 251-0425
Fax: (720) 251-0425
Email: gadeir.abbas@gmail.com

*Licensed in Virginia, not in D.C.*
*Practice limited to federal matters*

COUNCIL ON AMERICAN-ISLAMIC
RELATIONS

BY:     /s/ Lena Masri
LENA F. MASRI (P73461)
Attorney for Plaintiff
National Litigation Director
453 New Jersey Ave, SE
Washington, DC 20003
Phone: (202) 488-8787

AKEEL & VALENTINE, PLLC

BY:     /s/ Shereef Akeel
SHEREEF H. AKEEL (P54345)
Attorney for Plaintiffs
888 W. Big Beaver Rd., Ste. 910
Troy, MI 48084
Phone: (248) 269-9595
shereef@akeelvalentine.com

Dated: March 13, 2017

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA

**LINDA SARSOUR,** *et al.*;      )
     )
        Plaintiffs,      )     **Case No. 17-cv-00120**
     )     **Hon. Anthony J. Trenga**
v.      )
     )
**DONALD J. TRUMP**, President of the United      )
States of America; in his official capacity, *et al.*;      )
     )
        Defendants.      )
                                                         /

## <u>BRIEF IN SUPPORT OF PLAINTIFFS' EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION</u>

# Table of Contents

Table of Contents ........................................................................................................... 4

Table of Authorities ....................................................................................................... 6

Introduction .................................................................................................................... 1

Factual Background ........................................................................................................ 2

   A.   The Revised Muslim Ban .................................................................................. 2

   B.   The Plaintiffs Bringing This Emergency Motion .......................................... 6

     a.   Plaintiffs Hussam Ayloush, Basim Elkarra and Adam Soltani ...................... 6

     b.   Plaintiff John Doe No. 6 – a United States Citizen ........................................ 6

     c.   John Doe Nos. 5, 7 and 8 – Legal Permanent Residents ................................. 7

     d.   John Doe Nos. 2 and 3 – F1 Students ............................................................. 7

Procedural History ......................................................................................................... 8

Standard of Review ........................................................................................................ 8

Argument ....................................................................................................................... 9

   A.   Plaintiffs are likely to suffer an irreparable harm if injunctive relief is not granted. ........ 9

   B.   Conversely, there is no likelihood of harm to the Defendants if injunctive relief is granted. Accordingly, the balance of hardships tips in favor of these Plaintiffs. .................................... 10

   C.   Plaintiffs are likely to succeed on the merits. ................................................ 12

     a.   Because each Plaintiff is tangibly impacted by the Revised Muslim Ban, each Plaintiff has standing to bring all claims. ............................................ 12

b.    Because the purpose of the Revised Muslim Ban is invidious and the effect is disparate, the Defendants have violated the Establishment Clause. ...................................................... 16

c.    The Revised Muslim Ban is discriminatory and targets Muslims for distinctive treatment in violation of the Jane and John Does' rights under the Equal Protection Clause............... 22

d.    Defendant Trump does not have the authority to give any person preference or priority or to discriminate on the basis of a person's nationality, the Revised Muslim Ban is an unconstitutional overreach in violation of Sec. 202(a)(1) of the Immigration Nationality Act. 26

D.    An injunction and declaratory relief is in the public interest. ......................................... 30

E.    These Plaintiffs have suffered a legal wrong as direct result of the Revised Muslim Ban, and accordingly have standing to request that the Revised Muslim Ban be set aside as unlawful. 31

Conclusion ............................................................................................................................. 31

Certificate of Service ............................................................................................................. 33

## Table of Authorities

**Cases**

*Abourezk v. Reagan*, 251 U.S. App. D.C. 355, 785 F.2d 1043 (1986) ........................................ 28

*Agostini v. Felton*, 521 U.S. 203 (1997) ................................................................. 16

*Allen v. Wright*, 468 U.S. 737 (1984) ................................................................. 14

*Bostic v. Schaefer*, 760 F.3d 352 (4th Cir. 2014) ................................................. 13, 14

*City of Boerne v. Flores*, 521 U.S. 507 (1997) ........................................................ 17

*Cooper v. U.S. Postal Service*, 577 F.3d 479 (2d Cir.2009) ........................................... 13

*Deerfield Medical Ctr. v. City of Deerfield*, 661 F.2d 328 (5th Cir. 1981) ........................... 9

*Edwards v. Aguillard*, 482 U.S. 578 (1987) ........................................... 17, 18, 20, 22

*Engel v. Vitale*, 370 U.S. 421 (1962) ................................................................ 13

*Enterprise Int'l, Inc. v. Corporacion Estatal Petroleva Ecuatoriana*, 762 F.2d 464 (5th Cir. 1985)

.................................................................................................... 9

*G. G. v. Gloucester Cnty. Sch. Bd*, 822 F.3d 709 (4th Cir. 2016) ...................................... 9

*Heckler v. Mathews*, 465 U.S. 728 (1984) .......................................................... 22, 23

Immigration Nationality Act of 1965, Section 1182(a)(3) ....................................... 28, 29, 30

*Kerry v. Din*, 135 S. Ct. 2128 (2015) ................................................................ 30

*Lexmark Int'l, Inc. v. Static Control Components* 134 S. Ct. 1377 (2014) .............................. 14

*Lujan v. National Wildlife Federation*, 110 S. Ct. 3177 (1990) ....................................... 31

*McCreary County, Ky. v. American Civil Liberties Union of Ky.*, 545 U.S. 844 (2005) ....... 13, 16

*Meiselman v. Paramount Film Distributing Corp.*, 180 F.2d 94 (4th Cir. 1950) .......................... 8

*Mellen v. Bunting*, 327 F.3d 355 (4th Cir. 2003) ..................................................... 16

*Moss v. Spartanburg Cty. Sch. Dist. Seven*, 683 F.3d 599 (4th Cir. 2012) ............................. 12

*Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville,* 508 U.S. 656

(1993) ................................................................................................................ 13

*Planned Parenthood Of S.C. Inc. v. Rose*, 361 F.3d 786 (4th Cir. 2004) .................................... 14

*Stone v. Graham*, 449 U.S. 39 (1980) .................................................................... 21, 22

*Suhre v. Haywood Cty.*, 131 F.3d 1083 (4th Cir. 1997) ........................................... 13

*Tiffany v. Forbes Custom Boats, Inc.*, 1992 U.S. App. LEXIS 6268 (4th Cir. Apr. 6, 1992) .. 9, 12

*Van Orden v. Perry*, 545 U.S. 677 (2005) ............................................................ 13

*Wallace v. Jaffree*, 472 U.S. 38 (1985) ................................................................... 16, 18

*Wash. v. Davis*, 426 U.S. 229 (1976) ..................................................................... 23, 24

*Wetzel v. Edwards*, 635 F.2d 283 (4th Cir. 1980) ........................................................ 8

**Statutes**

8 U.S.C. § 1152(a)(1)(A) ............................................................................. 27

8 U.S.C. § 1182(f) ........................................................................................ 27

Immigration Nationality Act of 1965, Section 1182(a)(1)(A) ........................................ 27

**Code of Federal Regulations**

46 Fed. Reg. 48107 (1981) ............................................................................ 27

6 Fed. Reg. 44751 ........................................................................................ 28

64 Fed. Reg. 55809 (1999) ............................................................................ 27

67 Fed. Reg. 69974 (2003) ............................................................................ 27

69 Fed. Reg. 2287 (2004) ............................................................................. 27

74 Fed. Reg. 4093 ........................................................................................ 28

76 Fed. Reg. 49277 ...................................................................................... 28

<u>**Introduction**</u>

This case is not about the security of our country. It does not seek to prevent the Trump Administration from investigating or arresting individuals suspected of or who are actually engaged in criminal activity. The plaintiffs do not seek to pare back the Trump Administration's responsibility to apply the standard Congress created to determine when to deny visas to foreign nationals who the federal government has "reasonable ground" to believe that they are engaged or likely to engage in terrorist activity. That is not the core of this action.

No—this case is about the treatment of Muslims and Islam in American. It is about whether the Establishment Clause and Equal Protection Clause will serve Muslims in much the same way those provisions have served other unpopular minorities in the past.

And what makes this case difficult is also what makes it, ultimately so easy: the Trump Administration's shameless and brazen conduct. These immigration restrictions began as a campaign promise to ban all Muslim immigration, evolved into a ban on only Muslim immigrants from seven countries, and ended up as a ban on all immigration from six countries that cumulatively contain more than 160 million Muslims—97 percent of the population of these countries. So, whatever characteristics can be attributed to President Trump's Revised Muslim Ban, subtlety is just not one of them.

Whether this Court measures the Revised Muslim ban against the Constitution or the Immigration and Naturalization Act, its unlawfulness is clear. Though the Constitution forbids the federal government from enacting policies animated by a desire to harm and stigmatize Muslims, the history and context of the Revised Muslim Ban reveal its invidious purpose. In defense of his desire to impose these immigration restrictions, Defendant Trump has variously claimed that "Islam hates us" and that "there is great hatred towards Americans by large segments of the Muslim population." His advisors have even claimed that Islam itself is not a religion and

that the United States could even become an Islamic government. And in language that leaves no room for interpretation, Congress explicitly prohibited the kind of discrimination the defendants are trying to embed into the immigration system.

The Revised Muslim Ban is just as transparently invidious, illegal, and unconstitutional as the last one. So, it is up to this Court to demonstrate that the Constitution has the wherewithal to withstand the clever repackaging of unlawful government conduct reflected in this latest executive action.

**Factual Background**

**A. The Revised Muslim Ban**

On December 7, 2015, Defendant Trump made an unprecedented campaign promise that, if fulfilled, would overtly discriminate against an entire religious group and officially broadcast a message of disfavor against one religion. That campaign promise remains on Defendant Trump's campaign website (**Ex. A**):

**DONALD J. TRUMP STATEMENT ON PREVENTING MUSLIM IMMIGRATION**

(New York, NY) December 7th, 2015, -- Donald J. Trump is calling for a total and complete shutdown of Muslims entering the United States until our country's representatives can figure out what is going on. According to Pew Research, among others, there is great hatred towards Americans by large segments of the Muslim population. Most recently, a poll from the Center for Security Policy released data showing "25% of those polled agreed that violence against Americans here in the United States is justified as a part of the global jihad" and 51% of those polled, "agreed that Muslims in America should have the choice of being governed according to Shariah." Shariah authorizes such atrocities as murder against non-believers who won't convert, beheadings and more unthinkable acts that pose great harm to Americans, especially women.

Mr. Trump stated, "Without looking at the various polling data, it is obvious to anybody the hatred is beyond comprehension. Where this hatred comes from and why we will have to determine. Until we are able to determine and understand this problem and the dangerous threat it poses, our country cannot be the victims of horrendous attacks by people that believe only in Jihad, and have no sense of reason

> or respect for human life. If I win the election for President, we are going to Make America Great Again." - Donald J. Trump

The proposal was justified by a poll conducted by a firm previously run by Defendant Trump's advisor, Ms. Kellyanne Conway. (**Ex. Z**). In fact, true to his campaign promise, as soon as Defendant Trump took office, on January 27, 2017, he issued Executive Order 13769, entitled "Protecting the Nation from Foreign Terrorist Entry into the United States" (the "First Muslim Ban"). The following day, his close advisor, Mr. Rudolf Giuliani boasted during a Fox News Interview in response to the question "does the ban have anything to do with religion" that,

> "I'm gonna tell you the whole history of it. When [Defendant Trump] first announced it, he said Muslim Ban. He called me up, he said put a commission together, show me the right way to do it legally. I put a commission together… and what we did was, we focused on, instead of religion, danger…. And that is what the ban is based on."[1] (**Ex. B**).

In essence, Mr. Giuliani conceded that the commission was formed to find a way to accomplish the goals of the Muslim Ban, without mentioning Islam or Muslims. It is no surprise then, that just hours before issuing the Order, Defendant Trump explained that the purpose of the Order was to give priority to Christians over Muslims to enter the country.[2] (**Ex. C**).

The reality is, however, that the First Muslim Ban was much broader in some ways than the Muslim ban proposed during Defendant Trump's presidential campaign. Rather, the First Muslim Ban would serve to expel Muslims from the United States in that it not only instituted a ban on entry into the United States of all individuals that originate from seven predominantly Muslim countries. It also prevented reentry and suspended all immigration benefits to foreign

---

[1] Trump asked for a 'Muslim Ban,' Giuliani says – and ordered a commission to do it 'legally,' The Washington Post, January 29, 2017, available at: https://www.washingtonpost.com/news/the-fix/wp/2017/01/29/trump-asked-for-a-muslim-ban-giuliani-says-and-ordered-a-commission-to-do-it-legally/?utm_term=.c95693070fb2

[2] Trump Favors Christian Refugees, Asked Advisors for Muslim Ban, January 30, 2017, transcript of interview available at: https://www.democracynow.org/2017/1/30/headlines/trump_favors_christian_refugees_asks_advisers_for_muslim_ban

nationals from the seven countries lawfully residing in the United States, forcing them to fall out of status.  (**Ex. AA**).  At the same time, it provided a way into the country for non-Muslims via the "religious-based persecution" exception, which can only be claimed by individuals who are not Muslim.  (**Ex. V, First Muslim Ban, Sec. 5(b)**)).  Put simply, the First Muslim Ban constituted a religious gerrymander—drawing distinctions that exclude the disfavored group—Muslims—while leaving others untouched.

The First Muslim Ban instituted a ban on entry into the United States by any citizen from seven predominantly Muslim countries, including Iraq, Iran, Libya, Somalia, Sudan, Syria, and Yemen (the "Banned Countries").  While the Order specified that the ban will be in place for only 90 days, the clear implications of the Order indicated an indefinite ban.  The Order itself overtly implied that individuals currently residing the in the U.S. having come here from one of the Banned Countries may very well be a terrorist or have hostility towards the U.S.  The Order warned that despite increased scrutiny following the attacks on September 11, 2001, "numerous foreign-born individuals have been convicted or implicated in terrorism-related crimes," including those who entered the U.S. through the visa and refugee programs.  (**Ex. V, Sec. 1**).  The stated "purpose" of the Order was to "prevent foreign-born individuals" who may be involved in "terrorism-related crimes" from entering the U.S. through "visitor, student, or employments visas, or who enter[] through the United States refugee resettlement program."  *Id.*  The First Muslim Ban further intended to "ensure that those admitted to this country do not bear hostile attitudes towards it" or who "would place violent ideologies over American law" or who would engage in "honor killings" or "other forms of violence against women."  *Id.*  The implication was clear: terrorists are already here and they came from the Banned Countries, of whom 97% are Muslim.  Finally, the Order contemplated further action be taken against all immigrants who are residing in the U.S. legally.

In other words, immigrants currently residing in the U.S. would be subject to a future application process that will subjectively evaluate their "goodness" before deciding whether to revoke their lawful status.

Recognizing the unlawfulness of the First Muslim Ban, the Ninth Circuit Court upheld a nationwide injunction. In response, the Defendants immediately began to formulate a revised executive order. On February 21, 2017, prior to Defendant Trump signing the Revised Muslim Ban, Presidential Senior Advisor Stephen Miller explained that the revised order was "going to have the same basic policy outcome for the country," confirming that the objective to ban as much Muslim immigration as the administration believes the judiciary will allow remained unchanged.[3] (**Ex. D**).

A few days later, on March 6, 2017, Defendant Trump signed Executive Order 13780, entitled "Executive Order Protecting the Nation From Foreign Terrorist Entry Into The United States (hereinafter the "Revised Muslim Ban"), that revoked the First Muslim Ban (**Ex. W, Sec. 13**) and creates a framework that although neutral on its face, carries through the same invidious intent insofar it essentially seeks to preserve a portion of the First Muslim Ban. The Revised Muslim Ban also establishes a case-by-case waiver scheme that the Trump administration can utilize to implement all of the religion-conscious, anti-Muslim preferences envisioned by the First Muslim ban. (**Ex. W, Revised Muslim Ban, Sec. 3(a))**.

Notably, the Revised Muslim Ban spends a significant amount of space defending the First Muslim Ban, claiming that "Defendant Trump exercised [his] authority under Article II of the

[3] Stephen Miller's Fox News interview is coming back to haunt President Trump, The Washington Post, March 9, 2017, available at: https://www.washingtonpost.com/news/the-fix/wp/2017/03/09/stephen-millers-fox-news-interview-is-coming-back-to-haunt-president-trump/?utm_term=.d96e059c6a60

Constitution and under section 212(f) of the INA" by issuing it, and that it did not discriminate on the basis of religion:

> Executive Order 13769 did not provide a basis for discriminating for or against members of any particular religion. While that order allowed for prioritization of refugee claims from members of persecuted religious minority groups, that priority applied to refugees from every nation, including those in which Islam is a minority religion, and it applied to minority sects within a religion. That order was not motivated by animus toward any religion, but was instead intended to protect the ability of religious minorities -- whoever they are and wherever they reside – to avail themselves of the USRAP in light of their particular challenges and circumstances. (**Ex. W, Sec. 1(b)(iv)**).

In the end, the Revised Muslim Ban maintains part of the immigration ban that the First Muslim Ban imposed: the part that prohibits nonimmigrant, nonresident Muslims from traveling to the United States.

### B. The Plaintiffs Bringing This Emergency Motion

#### a. <u>Plaintiffs Hussam Ayloush, Basim Elkarra and Adam Soltani</u>

Plaintiffs Hussam Ayloush, Basim Elkarra and Adam Soltani are American Muslims that are no longer able to bring their family members from Syria and Iran to visit them in the United States as a direct result of the Revised Muslim Ban as they otherwise would. They are prominent civil rights and grassroots activists that have had to change their conduct adversely in that they have been required to assist and advocate on behalf of Muslims targeted or stigmatized by the First Muslim Ban, push back against the anti-Muslim sentiment fomented and legitimized by Defendants, and defend their religion as a religion of peace on national media outlets and through grassroots efforts.

#### b. <u>Plaintiff John Doe No. 6 – a United States Citizen</u>

John Doe No. 6 is a Muslim and citizen of the United States. He recently filed for a marriage petition for his wife, who is currently pregnant with their child. His wife is a Sudanese Muslim residing outside the United States. His application for his wife, however will be subjected

to a more onerous application process that will require her to make heightened showings to obtain a waiver from the Revised Muslim Ban, pursuant to Sec. 3(c)(iv) of the Revised Muslim Ban, based solely on her Sudanese national origin.

### c. <u>John Doe Nos. 5, 7 and 8 – Legal Permanent Residents</u>

John Doe No. 7 is a Syrian Muslim who is a legal permanent resident residing in the United States. John Doe Nos. 5 and 8 are both Sudanese Muslims who have also been granted a legal permanent resident status and lawfully residing in the United States.

John Doe Nos. 5 and 7 each filed marriage petitions for their wives, which remain pending as of this date. Under the terms of the Revised Muslim Ban, once their marriage petitions are approved and their wives apply for a visa to enter the United States, their wives' visa applications will be subject to a more onerous application process that will require her to make heightened showings to obtain a waiver from the Revised Muslim Ban.

John Doe No. 8 filed a marriage petition for his wife, which was approved. She applied for a visa to enter the United States to reunite with her husband; however, her visa application remains pending. Under the terms of the Revised Muslim Ban, his wife's visa application will also be subject to a more onerous application process that will require her to make heightened showings to obtain a waiver from the Revised Muslim Ban.

### d. <u>John Doe Nos. 2 and 3 – F1 Students</u>

Plaintiff John Doe Nos. 2 and 3 are Muslim students of Somali and Yemeni national origin respectively, that are residing in the United States. Each were issued single-entry visas and have F-1 status expiring on the anticipated date of completion of their education.

In the event that Plaintiff John Doe Nos. 2 and 3 travel outside the country—travel that both intend to undertake—they will be subjected to a a more onerous application process that will require them to make heightened showings to obtain a waiver from the Revised Muslim Ban.

As a result, Plaintiff John Doe Nos. 2 and 3 are forced to avoid traveling in order to avoid risking forfeiting their F-1 status and jeopardizing their education. This inability to travel imposes a particular hardship because students frequently lose access to student housing during scheduled curriculum breaks, and if they are unable to travel home during those breaks, they risk re-entry and thereby their education. Yet even if housing accommodations during breaks were provided, the Revised Muslim Ban effectively deprives John Doe Nos. 2 and 3 from seeing their families, and they will be forced to miss out on holidays, weddings and funerals, for possibly the entire duration of their academic career.

## Procedural History

Executive Order 13769 entitled "Protecting the Nation from Terrorist Attacks by Foreign Nationals," was issued by Defendants on January 27, 2017 (the "First Muslim Ban"). Plaintiffs filed a Complaint for Injunctive and Declaratory Relief, three days later, on January 30, 2017. [Dkt. 1]. After the Ninth Circuit Court upheld a nationwide injunction of Executive Order 13769, Defendants issued Executive Order 13780 entitled "Protecting the Nation from Foreign Terrorist Entry into the United States," (the "Revised Muslim Ban") on March 6, 2017. Plaintiffs filed an Amended Complaint for Injunctive and Declaratory Relief on March 10, 2017. [Dkt. 11]. Defendants were properly served with a copy of the summons and complaint. The proofs of service, which have been mailed for filing with the Court. (**Ex. X**).

## Standard of Review

"The purpose of the preliminary injunction is to preserve the status quo until the rights of the parties can be fairly and fully investigated and determined by strictly legal proofs and according to the principles of equity." *Wetzel v. Edwards*, 635 F.2d 283, 286 (4th Cir. 1980); *Meiselman v. Paramount Film Distributing Corp.*, 180 F.2d 94, 97 (4th Cir. 1950). To obtain relief prior to the end of a case, plaintiffs must demonstrate that they are (1) "likely to succeed on the merits," (2)

"likely to suffer irreparable harm in the absence of an injunction, (3) that the "balance of hardships tips in [their] favor, and (4) that "the requested injunction is in the public interest." *G. G. v. Gloucester Cnty. Sch. Bd*, 822 F.3d 709, 724 (4th Cir. 2016). Because the purpose of a preliminary injunction standard is to "preserve the relative positions of the parties until a trial on the merits," the rules of evidence do not apply. *Id.* at 725. While "admissible evidence may be more persuasive than inadmissible evidence," a court may consider both. *Id.* Indeed, in determining whether to grant a preliminary injunction, "district courts may look to, and indeed in appropriate circumstances rely on, hearsay or other inadmissible evidence." *Id.* at 726.

<u>Argument</u>

**A. Plaintiffs are likely to suffer an irreparable harm if injunctive relief is not granted.**

If the Court does not enjoin the Revised Muslim Ban, each of the Plaintiffs will suffer irreparable harm, including violations of their First Amendment rights under the Establishment and Equal Protection Clauses, as well as the Administrative Procedure Act. For this reason alone, the Revised Muslim Ban imposes an irreparable injury on the Plaintiffs bringing this Motion.

As the Supreme Court has made clear, the deprivation of First Amendment rights "unquestionably constitutes irreparable injury." *Elrod v. Burns,* 427 U.S. 347, 373 (1976). "[A]n 'injury or claim is "irreparable" if it cannot be undone through monetary remedies.'" *Tiffany v. Forbes Custom Boats, Inc.*, 1992 U.S. App. LEXIS 6268 (4th Cir. Apr. 6, 1992) (quoting *Enterprise Int'l, Inc. v. Corporacion Estatal Petroleva Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985) (quoting *Deerfield Medical Ctr. v. City of Deerfield*, 661 F.2d 328, 338 (5th Cir. 1981)).

**B. Conversely, there is no likelihood of harm to the Defendants if injunctive relief is granted. Accordingly, the balance of hardships tips in favor of these Plaintiffs.**

Defendants cannot show a likelihood of harm if this Court was to grant the injunctive relief Plaintiffs are seeking. Accordingly, the balance of hardships clearly tips in favor of these Plaintiffs.

Defendant Trump called for his "Muslim Ban" in the immediate aftermath of the San Bernardino shooting. That shooting was perpetrated by an American-born citizen and a lawful permanent resident born in Pakistan. His proposed Muslim ban, however, would not have affected the ability of the American born, citizen shooter to attack. And certainly, neither this executive order nor the prior, now-enjoined one, would affect immigration from Pakistan. Thus, the proposed Muslim ban was aimed more at capturing and benefiting from the anti-Muslim sentiment that was sweeping the country than at addressing some security gap.

Indeed, the justification of this ban on Muslim immigration was not simply a manner of migration flows. The Muslim ban, instead, was conceived by then-Candidate Trump as a broadside against Islam itself. The announcement of the Muslim ban explained that "25% of those polled [600 Muslims living in the United States] agreed that violence against Americans here in the United States is justified as a part of the global jihad" and that "51%... agreed that Muslims in American should have the choice of being governed according to Shariah." (**Ex. A**). Then-candidate Trump's announcement even dipped his toe into theology, opining that "Shariah authorizes such atrocities as murder against non-believers who won't convert, beheadings and more unthinkable acts that pose great harm to Americans, especially women. *Id.*

In the immediate aftermath of the Orlando Shooting, during which Omar Mateen shot and killed 49 people, Defendant Trump doubled down on his proposed Muslim ban explaining that "they're pouring in and we don't know what we're doing." (**Ex. E**). He presented his Muslim ban

as a response to the Orlando Shooting even though the attacker was born in New York. Then-candidate Trump reasoned that "the only reason the killer was in America in the first place was because we allowed his family to come here" from Afghanistan. *Id.* Indeed, he explained that "the Boston bombers came here through political asylum," one of whom was born in the former Soviet Union while the other was born in Kyrgyzstan, and one of the San Bernardino shooters "was the child of immigrants from Pakistan." In all cases, he saw his Muslim ban as preventing Muslims from settling inside the United States where they may have kids who, decades later, will be more likely to commit acts of terrorism.

This disconnect became even more pronounced when Defendant Trump issued both Orders. Their scope did not include Afghanistan—from which the Orlando Shooter's parents immigrated. They did not include Pakistan, Russia, or Kyrgyzstan—from which one of the San Bernardino shooters and both Boston Bombers immigrated. Nor did they include any of the countries from which a terrorist killer immigrated.

The preamble to the Revised Muslim Ban emphasizes that the visa process "plays a crucial role in detecting individuals with terrorist ties and stopping them from entering" the country. (**Ex. V, Sec. 1**). It highlights the fact that the 9/11 hijackers, who were "19 foreign nationals" from Saudi Arabia, Egypt, Lebanon and the United Arab Emirates, were given visas, and that "[n]umerous foreign-born individuals have been convicted or implicated in terrorism-related crimes since September 11, 2001." *Id.* But among those who have perpetrated deadly acts of terrorism inside the United States, none were from any of the seven countries affected. (**Ex. F**). In fact, between Iraq, Iran, Somalia, Sudan, Yemen, Syria, and Libya—there have only been 17 actual terrorists who have immigrated from those countries to the United States and "committed or were convicted of attempting to commit a terrorist attack on U.S. soil from 1975 through 2015." (**Ex.**

G).  If Defendant Trump intended to prevent foreign nationals from committing acts of terrorism inside the United States, one would expect that countries from which the greatest number of terrorists have emerged to be included in the ban—countries like Egypt, Pakistan, and Saudi Arabia, the latter being the country of origin for more foreign national terrorists than the seven countries combined.  *Id.*  Instead, the Orders include Libya and Syria, from which exactly zero killers have immigrated, as well as Somalia and Yemen, which have together produced just one.

In short, the disconnect between the events that Defendant Trump relied upon to justify his propose Muslim ban and the language of the Orders – including the Revised Muslim Ban – he issued reveal that the intent was invidious and not grounded in a purpose to address security.  Thus, the likelihood of harm clearly tips in favor of Plaintiffs, and issuance of injunctive relief is warranted.

### C.  Plaintiffs are likely to succeed on the merits.

A showing of likelihood of success on the merits is required "only if there is no imbalance of hardship in favor of the plaintiff."  *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d at 808.  Only in the event where a plaintiff is unable to show that the hardship balance tips in his favor, will they be required to show a clear and convincing likelihood of success on the merits.  *Tiffany v. Forbes Custom Boats, Inc.*, 1992 U.S. App. LEXIS 6268 (4th Cir. Apr. 6, 1992).

### a.  <u>Because each Plaintiff is tangibly impacted by the Revised Muslim Ban, each Plaintiff has standing to bring all claims.</u>

First Amendment standing is unique. The courts are willing to recognize intangible harms due to the spiritual nature of the claims.  In the Fourth Circuit, for example,, "plaintiffs have been found to possess standing when they are 'spiritual[ly] affront[ed]' as a result of 'direct' and 'unwelcome' contact with [alleged religious symbolism] within their community."  *Moss v. Spartanburg Cty. Sch. Dist. Seven*, 683 F.3d 599, 605 (4th Cir. 2012) (quoting *Suhre v. Haywood*

*Cty.*, 131 F.3d 1083, 1086–87 (4th Cir. 1997)). "Feelings of marginalization and exclusion are cognizable forms of injury, particularly in the Establishment Clause context, because one of the core objectives of modern Establishment Clause jurisprudence has been to prevent the State from sending a message to non-adherents of a particular religion 'that they are *outsiders,* not full members of the political community.'" *Moss*, 683 F.3d at 607 (quoting *McCreary Cnty. v. ACLU,* 545 U.S. 844, 860 (2005) (emphasis added). In the context of alleged Establishment Clause violations, "[t]he injury often occurs when a plaintiff comes into contact with, or is exposed to, a government-promoted expression of religion." See *Van Orden v. Perry*, 545 U.S. 677, 682, 125 S. Ct. 2854, 162 L.Ed.2d 607 (2005) (plurality op.) (plaintiff challenging a display of the Ten Commandments outside the Texas State Capitol), or in public schools, *see Engel v. Vitale*, 370 U.S. 421, 423, 82 S. Ct. 1261, 8 L.Ed.2d 601 (1962) (plaintiff challenging a state program of daily classroom prayer). The injury in an "expression" case is simply exposure to a state-sponsored religious message. *Cooper v. U.S. Postal Service*, 577 F.3d 479, 489 (2d Cir.2009).

Moreover, the Fourth Circuit has established similar principles in Equal Protection Clause cases.The injury requirement can be satisfied "'[w]hen the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, .... [t]he "injury in fact" ... is the denial of equal treatment resulting from the imposition of the barrier[.]'" *Bostic v. Schaefer*, 760 F.3d 352, 372 (4th Cir. 2014) (quoting *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville,* 508 U.S. 656, 666 (1993)). Just like in Establishment Clause cases, "stigmatic injury stemming from discriminatory treatment is sufficient to satisfy standing's injury requirement if the plaintiff identifies 'some concrete interest with respect to which [he or she] [is] personally subject to discriminatory treatment' and '[t]hat interest independently satisf[ies] the causation requirement of standing doctrine.'" *Bostic*, 760

F.3d at 372 (quoting *Allen v. Wright*, 468 U.S. 737, 757 n. 22 (1984) *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components* 134 S. Ct. 1377 (2014)).

As the *Hassan* court noted:

"Unequal treatment is 'a type of personal injury [that] ha[s] long [been] recognized as judicially cognizable' . . . and virtually every circuit court has reaffirmed—as has the Supreme Court—that a 'discriminatory classification is itself a penalty'… and thus qualifies as an actual injury for standing purposes, where a citizen's right to equal treatment is at stake." *Id.* at 289–90 (3d Cir. 2015), *as amended* (Feb. 2, 2016) (citations omitted).

*See also Planned Parenthood Of S.C. Inc. v. Rose*, 361 F.3d 786, 790 (4th Cir. 2004) ("Discriminatory treatment is a harm that is sufficiently particular to qualify as an actual injury for standing purposes.").

The Revised Muslim Ban creates" a barrier that makes it more difficult" for John Doe Nos. 5, 6, 7, and 8 from reuniting with their foreign national spouses "than it is for members of another group will impose a John Doe Nos. 5, 6, 7, and 8's efforts to be reunited with their foreign national spouses. *Bostic v. Schaefer*, 760 F.3d 352, 372 (4th Cir. 2014). Each has filed for immigration benefits for their wives, and their wives' visas will be subjected to a separate and unequal waiver process that is heightened, entirely discretionary and unreviewable, pursuant to Sec. 3(c)(iv) of the Revised Muslim Ban. Once the Revised Muslim Ban goes into effect on March 16, 2017, these Plaintiffs' lives will be impacted by this distinct process that segregates and disadvantages their spouses as compared to other citizens and legal permanent residents with spouses that are not nationals of the Banned Countries affected by the Revised Muslim Ban.

The Revised Muslim Ban will also prevent John Doe Nos. 2 and 3 from engaging in international travel without forfeiting their F-1 status and jeopardizing their education, a distinct harm that has not been imposed on other foreign nationals not from the countries affected by the Revised Muslim Ban. As a result, they will be forced to miss holidays, weddings and funerals,

among other things, in their countries of origin. While they have lawful status to reside and study in the United States, each were issued single-entry visas and thus, are required to apply for new visas in the event that they travel abroad. They will be subjected to a heightened, entirely discretionary and unreviewable process in order to renew their student visas, pursuant to Sec. 3(c)(i) of the Revised Muslim Ban. This inability to travel imposes a particular hardship on them and other similarly situated foreign national students originating from the Banned Countries, because students frequently lose access to student housing during scheduled curriculum breaks, and if they are unable to travel home during those breaks, they risk forfeiting re-entry and thereby their education. Yet even if housing accommodations during breaks were provided, the Revised Muslim Ban effectively deprives John Doe Nos. 2 and 3 from seeing their families for possibly the entire duration of their academic career.

Plaintiffs Ayloush, Elkarra and Soltani, all American Muslims, are prominent civil rights activists who have had to spend a significant amount of their time after the First Muslim Ban was issued assisting and advocating on behalf of Muslims targeted by that order and pushing back against the anti-Muslim sentiment that Defendants have fomented and legitimized through their actions. Moreover, they are no longer able to bring their family members from Syria and Iran to visit them in the United States as a direct result of the Revised Muslim Ban. The plaintiffs want to facilitate relationships between their children and their foreign national relatives, and the Revised Muslim Ban would subject their family to a segregated, more onerous visa process that diminishes the prospects of their children knowing their foreign national relatives.

Each of the Plaintiffs have suffered and will continue to suffer an ongoing concrete and irreparable harm, in addition to psychological and spiritual consequences, since the initial announcement of the "Muslim Ban" as a result of the Defendants sending a message of (1) disfavor

and condemnation of their religion of Islam, (2) marginalization and exclusion of Muslims, including themselves, based on the false messaging that Muslims are prone to commit terrorism, (3) the endorsement of all religions over their own, (4) Muslims are outsiders, dangerous, and not full members of the political community, and (5) all non-adherents of Islam are insiders and therefore favored. These Plaintiffs have been personally confronted with a government-sponsored religious expression that directly touches their religious sensibilities. It is precisely Plaintiffs' interaction with and exposure to Defendants' conduct that gives rise to their injury.

        **b.**  **Because the purpose of the Revised Muslim Ban is invidious and the effect is disparate, the Defendants have violated the Establishment Clause.**

The First Amendment, applicable to the states through the Fourteenth Amendment, provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I. Laws intended to advance or inhibit religion, or having either effect, violate the Establishment Clause. *Agostini v. Felton*, 521 U.S. 203, 222-23 (1997).

In the Fourth Circuit, the *Lemon* Test controls the outcome of Establishment Clause claim. Here, the most relevant prong for this Honorable Court to consider is the purpose prong, which "contemplates an inquiry into the subjective intentions of the government." *Mellen v. Bunting*, 327 F.3d 355, 372 (4th Cir. 2003). Evidence of this subjective intent can come in many forms, but the process for assessing such evidence requires the Court to adopt the perspective of an "objective observer who takes account of the traditional external signs that show up in the text, legislative history, and implementation" of government action. *McCreary County, Ky. v. American Civil Liberties Union of Ky.*, 545 U.S. 844, 862 (2005). This legislative history includes statements made by the "prime sponsor" of government action. *Wallace v. Jaffree*, 472 U.S. 38, 42-43, 55-57 (1985). In addition to the text, legislative history, and the statements of government officials,

both the "historical context of the statute" and "the specific sequence of events leading to [its] passage" are relevant to the Court's intent inquiry. *Edwards v. Aguillard*, 482 U.S. 578, 587, 594-95 (1987). Beyond all of this, even the effects of government action can be evidence of purpose insofar as conduct that "disproportionately burden[s] a particular class of religious observers," may serve as "evidence of an impermissible legislative motive." *City of Boerne v. Flores*, 521 U.S. 507, 535 (1997).

Here, the evidence of Defendants' intent is overwhelming. To begin with, Defendant Trump alongside his advisors and appointees have repeatedly articulated their bigoted views on Islam and Muslims. At various times during the presidential campaign, Defendant Trump stated that he believes "there is great hatred towards Americans by large segments of the Muslim population." (**Ex. A**). "I think Islam hates us," was Defendant Trump's response to a question regarding his anti-Muslim campaign promises.[4] (**Ex. H**). Defendant Trump has likewise explained that in his view, "there is great hatred towards Americans by large segments of the Muslim population." *Id.*

Defendant Trump's bigoted, anti-Muslim views are shared by his closest advisors. During his presidential campaign, Defendant Trump's former national security advisor, Lt. General Michael Flynn, stated his belief that the "[f]ear of Muslims is rational." (**Ex. I**). Mr. Flynn has attributed the problem of Muslims committing acts of terrorism to Islam itself, referring to Islam as a "cancer." He has even described Islam, not as a religion, but as a political ideology: "Islam is a political ideology. It definitely hides behind being a religion." (**Ex. J**). A member of the national security advisory staff, Sebastian Gorka, when asked if Islam was religion, demurred and declined "to get into theological debates." (**Ex. K**). Presidential Chief Political Strategist Steven

---

[4] Donald Trump: 'I think Islam hates us,' CNN Politics, March 10, 2016, available at:
http://www.cnn.com/2016/03/09/politics/donald-trump-islam-hates-us/

Bannon has said that "Islam is not a religion of peace." (**Ex. L**). Mr. Bannon has said that he believes that an Islamic Republic can arise in the United States and that this process "starts slowly with the loss of the will to win." (**Ex. M**). He is also reported to have said that "the West is at war with Islam" and that Muslim communities in Europe are "eroding traditional Christian values." (**Ex. N**). Presidential Senior Advisor Stephen Miller, promoted something called "Islamo-Fascism Awareness Week as a college student—which, for him, was not many years ago. (**Ex. O**). As this Court determines Defendants' intent, these statements—made by the "prime sponsors" of the Revised Muslim Ban—must be taken into account. *Wallace v. Jaffree*, 472 U.S. 38, 42-43, 55-57 (1985).

Beyond the general views of Defendant Trump and his advisors, the Revised Muslim Ban's evolution, from the announcement of a Muslim ban during the campaign to the issuance of the First Muslim Ban, comprise "the specific sequence of events leading" to the challenged conduct. *Edwards v. Aguillard*, 482 U.S. 578, 587, 594-95 (1987). Here, there is no question; the Revised Muslim Ban is but the latest iteration of the vulgar and explicit ban on Muslim immigration then-candidate Trump made a pillar of his campaign. On December 7, 2015, while running for president, Defendant Trump "call[ed] for a total and complete shutdown of Muslims entering the United States." (**Ex. A**). In elaborating on how this proposal would work, then-candidate Trump explained that customs agents would ask travelers, "are you Muslim" and travelers who answered yes would not be allowed to enter. (**Ex. P**).

Speaking in the aftermath of the Orlando shooting, perpetrated by a citizen born in New York, Defendant Trump blamed Muslim immigration, claiming that "100,000 immigrants from the Middle East and many more from Muslim countries outside the Middle East" comprise a potential "better, more horrible version than the legendary Trojan Horse ever was." (**Ex. E**).

Defendant Trump also said "the Muslims have to help us figure out, there's tremendous hatred there."[5] (**Ex. Q**).  In sum, Defendant Trump generally utilized his policy proposal to prohibit Muslim immigration to denigrate Islam and to cast doubt on the loyalty of Muslims.

After the primaries, then-candidate Trump began using facially neutral language to describe his Muslim ban.  However, in a presidential debate, he explained that nothing had actually changed: "The Muslim ban is something that in some form has morphed into a extreme vetting from certain areas of the world." (**Ex. R**).  His spokesperson also confirmed that the facially neutral rhetoric was not a change in policy: "No…he has not back pedaled on his Muslim ban." (**Ex. Q**).

Hours before signing the First Muslim Ban, Defendant Trump explained that the Order was "going to help [persecuted Christians]" and that his intention in crafting the Order was to treat foreign nationals in the Banned Countries differently based on their faith.  The text of the Order did just that.  Sec. 5(b) directed DHS to prioritize "refugee claims made by individuals on the basis of religious-based persecution, provided that the religion of the individual is a minority religion in the individual's country of nationality."  (**Ex. V, Sec. 5(b)**).

The First Muslim Ban also included veiled references to Islam that were consistent with Defendant Trump and his advisors' views on Islam and the proposed Muslim Ban.  On the one hand, the Muslim Ban announcement claimed that Shari'ah—which Muslims consider to be the cumulative traditions of their faith—authorizes "murder against non-believers who won't convert, beheadings and more unthinkable acts that pose great harm to Americans, especially women." (**Ex. A**).  On the other, the First Muslim Ban captured this bigoted thought in a subtler way, declaring that our country should not admit persons "who would place violent ideologies over American Law."  (**Ex. V, Sec. 1**).

---

[5] Compilation of video footage available at: https://www.youtube.com/watch?v=hF2NpPIq5hQ

Thus, the First Muslim Ban, which applied to seven predominantly Muslim countries and created exceptions and preferences for persons from those countries who are not Muslim, entered our world as a campaign promise fulfilled. And while the First Muslim Ban did not ban all Muslim immigration to the United States, Rudy Giuliani—who consulted with Trump on the strategy of the text of the executive—explained that this was a tactical decision in accordance with a request by Defendant Trump "to show him the right way to do [the Muslim ban] legally."[6] (**Ex. B**).

After the Ninth Circuit upheld a nationwide injunction against the First Muslim Ban, Defendants began to formulate the Revised Muslim Ban. On February 21, 2017, Presidential Senior Advisor Stephen Miller explained to Fox News that the revised order was "going to have the same basic policy outcome for the country"[7] "with mostly minor technical differences," (**Ex. Y**) confirming that the objective to ban as much Muslim immigration as the administration believes the judiciary will allow remained unchanged. (**Ex. D**). Although the Revised Muslim Ban revokes the First Muslim Ban (**Ex. W, Sec. 3**), it creates a visa scheme, that although neutral on its face, allows case-by-case waivers such that the unlawful goals and explicitly anti-Muslim religious preferences of the First Muslim Ban could still be implemented fully, and on a discretionary and nonreviewable basis. At each stage of the Revised Muslim Ban's evolution, its invidious intent carries through. Because of "the specific sequence of events leading" to the Revised Muslim Ban, Plaintiffs are likely to succeed on their Establishment Clause claim. *Edwards v. Aguillard*, 482 U.S. 578, 587, 594-95 (1987).

---

[6] Trump asked for a 'Muslim Ban,' Giuliani says – and ordered a commission to do it 'legally,' The Washington Post, January 29, 2017, available at: https://www.washingtonpost.com/news/the-fix/wp/2017/01/29/trump-asked-for-a-muslim-ban-giuliani-says-and-ordered-a-commission-to-do-it-legally/?utm_term=.c95693070fb2

[7] Stephen Miller's Fox News interview is coming back to haunt President Trump, The Washington Post, March 9, 2017, available at: https://www.washingtonpost.com/news/the-fix/wp/2017/03/09/stephen-millers-fox-news-interview-is-coming-back-to-haunt-president-trump/?utm_term=.d96e059c6a60

While the Revised Muslim Ban includes brand new post-facto rationalizations for its ban that are facially neutral, the purpose prong of the *Lemon* test mandates that "the secular purpose…be genuine, not a sham." ***McCreary Cnty. v. ACLU,*** 545 U.S. 844 (2005). Here, as in *Mcreary,* "openly available data support[s] a commonsense conclusion that a religious objective" is the true aim of this Order. Additionally, this Court cannot "ignore perfectly probative evidence," including the explicit push for a Muslim ban, the various bigoted views of Islam held and expounded upon at length by Defendant Trump's advisors, and the First Muslim Ban's religious gerrymandering that made clear its aim was to apply to Muslims alone. *Id.* "Reasonable observers have reasonable memories, and our precedents sensibly forbid an observer to turn a blind eye to the context in which the policy arose." *Id.*

Indeed, the declared purpose of the Revised Muslim Ban is not the end of this Court's inquiry. In *Stone*, for example, the Supreme Court found an Establishment Clause violation, even though the state of Kentucky explicitly declared a "secular legislative purpose." *Stone v. Graham*, 449 U.S. 39, 40 (1980). Simply put, "an "avowed" secular purpose is not sufficient to avoid conflict with the First Amendment. *Stone v. Graham*, 449 U.S. 39, 41 (1980).

The government will argue that, in promulgating a rule regarding the entry of persons into the United States, Defendant Trump with the purpose of protecting national security. But even if the President has wide authorities to alter immigration rules and regulate entry into the United States, there is no exception to the Establishment Clause that would obviate the need for this Court to determine whether, in exercising his authority, the President did so with an impermissible intent. Indeed, the Supreme Court has been clear that the Establishment Clause prohibits actions—that in other contexts may be lawful—which are motivated by an intent to favor or disfavor a religion.

In *Edwards,* the United States Supreme Court struck down a law that mandated the teaching of creation science alongside evolution.  In striking the law down, though, the Court noted that it did not mean to suggest that government "could never require that scientific critiques of prevailing scientific theories be taught," suggesting that there could be a permissible context for requiring the teaching of creation science in schools.  *Edwards v. Aguillard*, 482 U.S. 578, 593 (1987).  As the Supreme Court noted, "teaching a variety of scientific theories about the origins of humankind to schoolchildren might be validly done with the clear secular intent of enhancing the effectiveness of science instruction."  *Edwards v. Aguillard*, 482 U.S. at 578, 594.  Similarly, in *Stone v. Graham,* the United States Supreme Court struck down a law requiring public classrooms to post a copy of the Ten Commandments.  *Stone v. Graham*, 449 U.S. 39, 39 (1980).

Even if this Court believes that Defendant Trump generally has the authority to bar classes of immigrants from entering the United States, he cannot do what would otherwise be lawful if the objective is to disfavor a religion and its adherents.  The history of Revised Muslim Ban makes clear that this attempt to ban some Muslim immigration is aimed at disfavoring Islam and Muslims.

    c. **The Revised Muslim Ban is discriminatory and targets Muslims for distinctive treatment in violation of the Jane and John Does' rights under the Equal Protection Clause.**

To prove an equal protection clause violation, a plaintiff must show that "invidious discriminatory purpose was a motivating factor."  *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977).  "[D]iscrimination itself, by perpetuating 'archaic and stereotypic notions' or by stigmatizing members of the disfavored group as innately inferior and therefore as less worthy participants in the political community, can cause serious non-economic injuries to those persons who are personally denied equal treatment solely because of their membership in a disfavored group" (internal quotation marks and citation omitted).  *Heckler v. Mathews*, 465 U.S. 728, 739-40 (1984).

This Court must review many sources of evidence to determine whether the challenged government action contains impermissible intent. First, the Court should assess whether "the law bears more heavily on one [protected class] than another," which—though not dispositive—is "not irrelevant." *Wash. v. Davis*, 426 U.S. 229, 242 (1976). Indeed, disparate impact provides "an important starting point" for this intent inquiry. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. at 252, 266. Second, the Court should review the "specific sequence of events leading up to the challenged decision," which will "shed some light on the decisionmaker's purposes." *Id.* at 267. Third, the Court must determine whether, in making the decision and establishing the decision's parameters, the government made "[d]epartures from the normal procedural sequence" and whether "factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached." *Id.* at 267.

To begin with, there is no doubt that the Revised Muslim Ban "bears more heavily" on Muslims than any other group. *Wash. v. Davis*, 426 U.S. 229, 242 (1976). According to the CIA's Factbook, which records the percentage of Muslim populations, the countries affected are not simply Muslim majority. Rather, Muslims comprise more than 95% of the population of five of the six countries: Libya is 96.6 percent Muslim, Iran is 99.4 percent Muslim, Yemen is 99.1 percent Muslim, and Syria is 87 percent Muslim. The United Nations reports that Sudan is more than 97 percent Muslim (**Ex. S**) and that Somalia is 99 percent Muslim. (**Ex. T at 22**). In sum, there are approximately 166 million people in these six countries, all of whom will be affected by the Revised Muslim Ban, and 97 percent of whom are Muslim.

As the United States Supreme Court explained in *Washington v. Davis,* it is "not infrequently true that discriminatory impact… may for all practical purposes demonstrate unconstitutionality." *Wash. v. Davis*, 426 U.S. at 229, 242. This is just such a case: 97 percent of

the people affected by the Revised Muslim Ban are Muslim, and this "seriously disproportionate exclusion" of Muslim foreign nationals from the United States provides unequivocal evidence of the Defendants' discriminatory intent. *Id.*

Second, the "specific sequence of events" that culminated in the issuance of the Revised Muslim Ban reveals that Defendants' intent was invidious. Plaintiffs have laid out above how this Order can be traced back to then-candidate Trump's proposal for a "total and complete ban on Muslim immigration." That "sequence of events" provides an additional indication that the Trump administration's intent was unlawful.

Finally, the Revised Muslim Ban was issued in a manner that both "departed from the normal procedural sequence" and ignored "factors usually considered important by the decisionmaker." *Wash. v. Davis*, 426 U.S. at 267. To begin with, it is abnormal for a single policy—in this case, a set of immigration restrictions and directives—to abandon its original justification and adopt an entirely new one on multiple occasions. Defendant Trump introduced this Order as a "total and complete ban on Muslim immigration" in response to a terrorist attack perpetrated by a US citizen and a lawful permanent resident from Pakistan. He justified this policy on the basis that "there is great hatred towards Americans by large segments of the Muslim population." (**Ex. A**). But when Defendant Trump signed the First Muslim Ban, he limited his order to seven countries with a combined population of approximately 160 million Muslims— approximately 10 percent of the entire global Muslim population. And instead of justifying this policy by referencing the "great hatred towards Americans by large segments of the Muslim population," Defendant Trump adopted a different rationale: "[d]eteriorating conditions in certain countries due to war, strife, disaster, and civil unrest increase the likelihood that terrorists will use any means possible to enter the United States." (**Ex. V, Sec. 1**). Additionally, the First Muslim

Ban included a new justification: that the United States "cannot, and should not, admit…those who would place violent ideologies over American law, who engage in acts of bigotry or hatred, or those who would oppress Americans of any race, gender, or sexual orientation"—which, together, comprise a set of false, anti-Muslim smears that have been propogated at various times by Defendant Trump and his closest advisors.

The Revised Muslim Ban altogether abandons those smears and replaces the categorical suspension of visa issuance to seven groups of foreign nationals with an exception laden scheme that does not comport with the problem it claims to address. Defendant Trump again shifted his justification for the suspension of immigration from six countries on the basis that "the risk of erroneously permitting entry of a national of one of these countries who intends to commit terrorist acts…is unacceptably high." (**Ex. W, Sec. 1(f)**). At the same time, the Order permits "lawful permanent residents," foreign nationals "admitted to or paroled into the United States" and valid visa-holders to enter the United States. The Order also creates a waiver process which, though it subjects foreign nationals from these six countries to a disparate standard, replicates the case-by-case determinations that the Order claims creates an "unacceptably high" risk of admitting dangerous people. In short, the Revised Muslim Ban now claims that the government is unable to determine who can safely be admitted into the United States to justify a categorical suspension of immigration and then demands that the government determine who can be safely admitted into the United States. The shifts in justification and abnormal policy evolution—abandoning some rationales, adopting entirely new ones, and then fashioning a policy that replicates the problem it claims to address—can be explained only by an invidious purpose.

The Revised Muslim Ban also ignores "factors usually considered important by the decisionmaker" which, in this case, include the assessment of DHS's Intelligence and Analysis

unit.  In a leaked document that contains language that the Revised Muslim Ban draws from, DHS

concludes—in the title of the document itself—that "[c]itizenship [is] likely an unreliable indicator

of terrorist threat to the United States. (**Ex. U**).  The report goes on to state that "relatively few

citizens of the seven countries impacted by E.O. 13769, compared to neighboring countries,

maintain access to the United States" and are "rarely implicated in U.S.-[b]ased terrorism."  *Id.*

Notably, the report also concedes that since the start of the ongoing conflict in Syria in March,

2011, not a single Syrian national committed an act of terrorism in the United States or was even

charged with a terrorism-related offense.  *Id.*  The report includes the bubble-bursting conclusion

that terrorist groups "in Iran, Libya, Somalia, and Sudan remain regionally focused" and that of

the 82 "foreign-born individuals" who "died in pursuit of or were convicted of any terrorism-

related federal offense inspired by a foreign terrorist organization" the top seven countries of origin

were: "Pakistan (5), Somalia (3), and Bangladesh, Cuba, Ethiopia, Iraq, and Uzbekistan (2)," all

but one not affected by the Revised Muslim Ban."  *Id.*  While the Revised Muslim Ban borrows

language from this report regarding the country conditions of the six affected nations, it ignores

the reports' conclusion.  Simply put, in issuing this Order, Defendants set aside what is typically

critical—DHS intelligence and analysis.  This is yet another basis upon which the Court can make

a finding of invidious intent.

> **d.  Defendant Trump does not have the authority to give any person preference or priority or to discriminate on the basis of a person's nationality, the Revised Muslim Ban is an unconstitutional overreach in violation of Sec. 202(a)(1) of the Immigration Nationality Act.**

The Revised Muslim Ban violates the Immigration Nationality Act ("INA") for two

reasons.  First, it discriminates on the basis of nationality, conduct Congress has expressly

forbidden.  And second, the Order creates a new terrorism-related inadmissibility scheme which,

in many ways, is precisely opposite of the scheme Congress has created and honed over decades.

To begin with, Congress long ago forbade the Executive Branch from embedding discrimination into the country's immigration system. In a statutory section titled "Nondiscrimination," Congress made its wishes known: "no person shall receive any preference or priority or be discriminated against in the issuance of an immigrant visa because of the person'…nationality." 8 U.S.C. § 1152(a)(1)(A). This provision became law in 1965 and no law since has modified its terms.

The Defendants will argue that INA Sec. 8 U.S.C. § 1182(f), a law passed more than a decade before the non-discrimination directive—empowers the president to issue the Revised Muslim Ban. INA Sec. 1182(f) states that "[w]henever the president finds that entry of any aliens or any class of aliens into the United States would be detrimental to the interests of the United States," the President may "suspend the entry of all aliens or any class of aliens." *Id.* Besides pre-dating INA Sec. 1182(a)(1)(A)'s nondiscrimination directive, no president has ever utilized this section in the manner done here.

In 1981, President Reagan issued Proclamation 4865 which suspended "entry of undocumented aliens from the high seas." 46 Fed. Reg. 48107 (1981). In 1999, President Clinton published a memorandum based on INA Sec. 1182(f) that delegated to the Attorney General the authority to screen "undocumented persons she has reason to believe is seeking to enter the United States and who is encountered in a vessel interdicted on the high seas." 64 Fed. Reg. 55809 (1999). President George W. Bush's Executive Order 13276 relied on Sec. 1182(f) to delegate responsibilities "for responding to migration of undocumented aliens in the Caribbean region. 67 Fed. Reg. 69974 (2003). He also relied on INA Sec. 1182(f) to "suspend the entry into the United States…of certain persons who have committed, participated in, or are beneficiaries of corruption in the performance of public functions." 69 Fed. Reg. 2287 (2004). He also used INA Sec. 1182(f)

to suspend entry to the United States "of certain senior government officials...who have impeded their government's antitrafficking efforts" or otherwise not adhered to antitrafficking measures and standards.  74 Fed. Reg. 4093.  President Obama used INA Sec. 1182(f) to suspend the entry of aliens "who are subject to United Nationals Security Council travel bans" (76 Fed. Reg. 44751) and well as those who are "serious violators of human rights and humanitarian law" (76 Fed. Reg. 49277).  This pattern of practice is consistent with the DC Circuit's observation that INA Sec. 1182(f) provides "sweeping proclamation power…against the danger posed by any particular case or class of cases *that is not covered by one of the categories in Sec. 1182(a).*"  *Abourezk v. Reagan*, 251 U.S. App. D.C. 355 n.2, 785 F.2d 1043, 1049 (1986) (emphasis added).

Not only has Congress prohibited nationality-based discrimination, it has also directed the Executive Branch to apply a specific set of criteria to determine whether an immigrant applicant should be denied entry on the basis of terrorism-related concerns.  In a statutory section titled "Classes of Aliens Ineligible for Visas or Admission," Congress again limited the executive branch's discretion by creating a scheme for determining inadmissibility.  INA Sec. 1182(a)(3)(B) directs the Executive Branch to deny visas to persons who have "engaged in a terrorist activity," "incited terrorist activity," who are a "representative…of a terrorist organization" or a "group that endorses or espouses terrorist activity, who are members "of a terrorist organization," "endors[e] or espous[e] terrorist activity."  This complex statutory scheme indicates that Congress anticipated that the Executive Branch would make immigration decisions that have national security implications, and that Congress had in mind exactly how it wanted the Executive Branch to exercise the authority delegated to it.

Tellingly, this statutory scheme establishes an evidentiary threshold that the Executive Branch must meet if it denies visas to persons on terrorism-related grounds.  The law only allows

the Executive Branch to deny a visa to a person who "is engaged in or is likely to engage after entry in any terrorist activity" if there is at least "reasonable ground" for such a conclusion. INA, Sec. 1182(a)(3))(B)(i)(ii). Congress could have established a different threshold or delegated the creation of a standard of determining the threat posed by prospective immigrants. But Congress was specific; only when there is "reasonable ground to believe" that an immigrant is "likely to engage" in terrorist activity can the Executive Branch deny a visa. *Id.*

Displacing this statutory scheme and running roughshod over Congress's half-century non-discrimination directive, the Executive Order applies to more than 160 million people and excludes them from our immigration system. Even though Congress created a mechanism for denying visas on the basis of concerns of terrorism and charged the Executive Branch with administering its scheme, the Order pushes that to the side with respect to Syria, Iran, Somalia, Libya and Yemen. Defendant Trump instead concludes that "their nationals continue to present heightened risks to the security of the United States. (**Ex. W, Sec. 1(e)**). On the basis of this conclusion, Defendant Trump ignores Congress and simply suspends immigration from these six countries.

Moreover, in a transparent attempt to complicate Plaintiffs' standing, the Executive Order creates a separate scheme of exemptions and heightened standards that have nothing to do with what Congress has required. Whereas Congress established a "reasonable ground[s]" threshold to exclude prospective immigrants on the basis of terrorism threats, the Order requires foreign nationals to demonstrate that a visa denial "would cause undue hardship" and that entry "would be in the national interest." (**Ex. W, Sec. 3(c)**). Remarkably, the Order reverses the burden of proof that Congress established by requiring foreign nationals to demonstrate that their entry "would not pose a threat to national security" to the "satisfaction" of the consular official. *Id.* This scheme runs afoul of the standard Congress established that requires the Executive Branch to uncover

"reasonable ground[s]" for believing that a foreign national poses a threat of terrorism. INA, Sec. 1182(a)(3)(B)(i)(ii).

The Supreme Court recently emphasized the importance of this statutory scheme in issuing visa denials. In *Kerry v. Din,* a consular official denied a foreign national a visa on the basis of INA Sec. 1182(a)(3)(B)'s terrorism bar. But visa denials are not a discretionary determination. Rather, "the consular officer's determination that [the foreign national] was ineligible for a visa was controlled by specific statutory factors." *Kerry v. Din*, 135 S. Ct. 2128, 2140 (2015). The Supreme Court emphasized that the consular officer must "show that the denial rested on a determination that [the foreign national] did not satisfy the statute's requirements." *Id.* The subtext is that, had the consular official based the visa denial on factors not identified by Congress, it would not have been "facially legitimate and bona fide" and thus open to a challenge. *Id.*

### D. An injunction and declaratory relief is in the public interest.

The final factor the Court consider is whether the public interest would be served by issuance of the injunction. *G. G. v. Gloucester Cnty. Sch. Bd*, 822 F.3d 709 at 724. Because the history and text of the First Muslim Ban reveal an illegal purpose and effect, because the effects of the Revised Muslim Ban continue to impact foreign nationals whose visa applications were not approved pursuant to the First Muslim Ban, and because the illegal purpose and effect of the First Muslim Ban can still be accomplished through the Revised Muslim Ban via the case-by-case discretionary and nonreviewable waivers, there is no doubt that it is in the public's best interests to enjoin the Revised Muslim Ban and to declare it unconstitutional to afford relief from the uncertainty, insecurity and controversy it brings.

### E. These Plaintiffs have suffered a legal wrong as direct result of the Revised Muslim Ban, and accordingly have standing to request that the Revised Muslim Ban be set aside as unlawful.

In order to obtain judicial review under the general review provisions of the Administrative Procedure Act, the person claiming the right to sue must identify some agency action that affects him in specified fashion and must show that he has suffered legal wrong because of the challenged agency action or is adversely affected or aggrieved by that action within the meaning of a relevant statute. *Lujan v. National Wildlife Federation*, 110 S. Ct. 3177 (1990). "Agency Action" is defined under 5 U.S.C. § 551(13), as "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act."

Plaintiffs have each alleged that they have and will suffer legal wrongs and that they have and will be adversely affected as a direct result of the Revised Muslim Ban. Accordingly, they have standing to challenge the Revised Muslim Ban and to request that it be aside as unlawful.

### <u>Conclusion</u>

**WHEREFORE,** for the reasons discussed above, Plaintiffs respectfully request this Honorable Court GRANT their Emergency Motion for Temporary Restraining Order and/or Preliminary Injunction, and grant costs, attorneys' fees, and any other relief it deems just and equitable.

Respectfully submitted,

THE LAW OFFICE OF GADEIR ABBAS

BY: /s/ Gadeir Abbas
GADEIR I. ABBAS
Attorney for Plaintiff
1155 F Street NW, Suite 1050
Washington, D.C. 20004
Telephone: (720) 251-0425
Fax: (720) 251-0425
Email: gadeir.abbas@gmail.com

*Licensed in Virginia, not in D.C.*
*Practice limited to federal matters*

COUNCIL ON AMERICAN-ISLAMIC
RELATIONS

BY: /s/ Lena Masri
LENA F. MASRI (P73461)
Attorney for Plaintiff
National Litigation Director
453 New Jersey Ave, SE
Washington, DC 20003
Phone: (202) 488-8787

AKEEL & VALENTINE, PLLC

BY: /s/ Shereef Akeel
SHEREEF H. AKEEL (P54345)
Attorney for Plaintiffs
888 W. Big Beaver Rd., Ste. 910
Troy, MI 48084
Phone: (248) 269-9595
shereef@akeelvalentine.com

Dated: March 13, 2017

**Certificate of Service**

I hereby certify that on March 13, 2017, I electronically filed the foregoing document with the Clerk of the Court for the Eastern District of Virginia using the ECF System, which will send notification to the registered participants of the ECF System as listed on the Court's Notice of Electronic Filing.

*/s/ Gadeir Abbas*