**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

LINDA SARSOUR, *et al.*;

Plaintiffs,

v.

DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*;

Defendants.

No. 1:17-cv-00120(AJT/IDD)

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

INTRODUCTION ..... 1

BACKGROUND ..... 2

I. The Immigration and Nationality Act. ..... 2

II. The Revoked Order ..... 4

III. Litigation Challenging the Revoked Order ..... 4

IV. The Order. ..... 5

A. The Order's Temporary Entry Suspension ..... 6

B. The Order's Waiver Provision. ..... 7

V. Litigation Concerning the Order ..... 8

STANDARD OF REVIEW ..... 8

ARGUMENT ..... 9

I. Plaintiffs Do Not Allege Any Harm That Requires Emergency Relief ..... 9

A. Plaintiffs Have Not Alleged Irreparable Harm Related To Visas or Entries ..... 10

B. Plaintiffs Have Not Alleged Any Other Form of Irreparable Harm. ..... 12

II. Plaintiff's Do Not Clearly Demonstrate They Are Likely to Succeed on the Merits ..... 14

A. Plaintiffs' Challenges to the Order Are Not Justiciable ..... 14

B. The Order is a Valid Exercise of the President's Authority ..... 16

1. The Order falls squarely within the President's broad authority under Sections 1182(f) and 1185(a). ..... 16

2. Section 1152 does not prevent the President from suspending the entry of nationals from the designated foreign countries ..... 17

3. Section 1182(a) does not prevent the President from suspending the entry of nationals from the designated countries ..... 20

4. The Order Does Not Discriminate on the Basis of Religion....................................21

a. The Order Draws Distinctions on the Basis of Risk, not Religion........................22

b. The Order Cannot be Restrained on the Basis of Campaign Statements..............24

III. The Balance of Equities and Public Interest Weigh Strongly Against Injunctive Relief. ...........................................................................................................................28

IV. The Facial Sweeping Relief Sought is Unwarranted. ..................................................................30

CONCLUSION..................................................................................................................................30

## INTRODUCTION

Consistent with the Executive's broad constitutional authority over foreign affairs and national security, Sections 1182(f) and 1185(a) of Title 8 expressly authorize the President to restrict or suspend entry of any class of aliens when in the national interest. Exercising that authority, the President issued Executive Order ("E.O.") No. 13,780 ("Order"), which temporarily suspends (i) entry of certain foreign nationals from six countries that Congress and the previous Administration determined pose a heightened terrorism risk and (ii) processing of refugee applications. 82 Fed. Reg. 13,209 (Mar. 6, 2017). Those suspensions apply only for a short period, to enable the new Administration to review screening and vetting procedures to ensure that they adequately detect terrorists. For the past 30 years, every President has invoked his power to protect the interests of the United States by suspending the entry of categories of aliens. As a legal matter, the Order is no different.

The Order replaces former Executive Order No. 13,769, 82 Fed. Reg. 8977 (2017) ("Revoked Order").[1] After the Ninth Circuit declined to stay a nationwide injunction against the Revoked Order, the President decided to develop a new Order that was more narrowly tailored to meet the articulable national security risks and that also addressed judicial concerns, rather than engaging in protracted litigation. Unlike the Revoked Order, the Order applies only to aliens outside the United States who lack a visa—individuals who "ha[ve] no constitutional rights regarding" their admission. *Landon v. Plasencia*, 459 U.S. 21, 32 (1982). Even as to them, the Order includes a comprehensive waiver process to mitigate undue hardships. It also eliminates any priority in refugee admissions based on religious minority persecution. On its face and in practice, the Order is only about protecting those in the United States from risks posed by some foreign nationals. These changes are fatal to plaintiffs' claims.

First, plaintiffs have not alleged any irreparable harm that would be suffered during the period of a TRO; and indeed, their allegations of harm are so scant that plaintiffs' claims are not justiciable.

[1] The Order's terms revoked E.O. 13,769 at 12:01 AM on March 16, 2017. *See* Order § 13.

Plaintiffs allege that the Order imposes a stigmatic injury as "a state-sponsored religious message." Pls. TRO Mot., ECF No. 13 ("Mot."), at 13. But even assuming this were true, controlling precedent is clear that an abstract, stigmatic injury alone is insufficient to confer Article III standing. Nor have plaintiffs described any injury that is concrete, certain, and impending from application of the Order's visa provisions: by its terms, the Order does not apply to any of the plaintiffs themselves. And their claimed injuries regarding the travel of family members rely on layers of speculation about future events, including both the denial of the waivers provided for in the Order and those persons' ability to obtain a visa (which is a privilege, not a right) in the absence of the Order.

Second, the changes to the Order foreclose plaintiffs' claims on the merits. Two separate provisions of the immigration laws grant the President broad authority plainly encompassing the Order's entry suspensions. As a constitutional matter, the Order does not cover any aliens with due-process rights with respect to entry, and the Order accords ample process through a waiver system. Nor does it discriminate on the basis of religion. Its text and purpose are explicitly religion-neutral.

Third, the changes to the Order eliminate any occasion to consider emergency relief. No immediate upheaval would occur as a result of the new Order taking effect. No visa will be revoked. No lawful permanent resident traveling abroad will be barred from returning. Nobody lawfully in the United States loses any prior ability to leave the country to travel and later return. And plaintiffs have identified no harm that will befall them at any time absent an injunction, which is not surprising, since plaintiffs raised many of the same allegations in their original complaint six weeks ago and have not diligently sought to proceed with this lawsuit in the interim. There is no basis to restrain the Order temporarily, and certainly no basis to restrain it in its entirety. Plaintiffs' motion should thus be denied.

## BACKGROUND

### I. The Immigration and Nationality Act

The Immigration and Nationality Act, 8 U.S.C. §§1101 *et seq.*, governs admission of aliens into

the United States. Admission, aside from lawful permanent residents ("LPRs"), generally requires a valid immigrant or nonimmigrant visa (or another entry document, such as a refugee travel document). *Id.* §§1181, 1182(a)(7)(A)(i), (B)(i)(II), 1203. The process of obtaining a visa typically includes an in-person interview and results in a decision by a State Department consular officer. *Id.* §§1201(a)(1), 1202, 1204. Eligibility for a visa depends on many factors, including nationality. *See, e.g., id.* §§1184(e), 1735. While a visa allows an alien to seek admission, it does not guarantee admission if the alien, upon arriving, is found "inadmissible." *Id.* §§1201(h), 1225(a).

Congress has created a Visa Waiver Program that enables nationals of participating countries to seek temporary admission for tourism or certain business purposes without a visa. 8 U.S.C. §§1182(a)(7)(B)(iv), 1187. In 2015, however, Congress excluded from the Program individuals with connections to specific countries. *Id.* §1187(a)(12). Congress itself specifically excluded nationals of countries participating in the Program who are dual nationals of or had recently visited Iraq or Syria, where "[t]he Islamic State of Iraq and the Levant (ISIL) … maintain[s] a formidable force," and nationals of and recent visitors to countries designated by the Secretary of State as state sponsors of terrorism (currently Iran, Sudan, and Syria).[2] 8 U.S.C. §1187(a)(12)(A)(i)-(ii); Congress also authorized the Department of Homeland Security (DHS) to designate additional countries of concern, considering whether a country is a "safe haven for terrorists," "whether a foreign terrorist organization has a significant presence" in the country, and "whether the presence of an alien in the country … increases the likelihood that the alien is a credible threat to" U.S. national security, *id.* §1187(a)(12)(D)(i)-(ii). And in February 2016 DHS excluded recent visitors to Libya, Somalia, and Yemen, noting that the designation was "indicative of the Department's continued focus on the threat of foreign fighters."[3] In short, Congress and the prior Administration determined that the conditions

[2] U.S. Dep't of State, Country Reports on Terrorism 6 (2016), https://www.state.gov/documents/organization/258249.pdf.

[3] https://www.dhs.gov/news/2016/02/18/dhs-announces-further-travel-restrictions-visa-waiver-program.

in these seven countries warranted individualized review in admitting aliens into our Nation's borders.

Critically, Congress also has accorded the Executive broad discretion to suspend entry of aliens. First, Section 1182(f) provides:

> Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.

Second, Section 1185(a)(1) makes it unlawful for an alien to enter or attempt to enter the country "except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe." *See also* E.O. 13323 (delegating authority to DHS).

## II. The Revoked Order

On January 27, 2017, the President issued the Revoked Order. It directed the Secretaries of Homeland Security and State to assess current screening procedures to determine whether they were sufficient to detect individuals who were seeking to enter this country to do it harm. Revoked Order §3(a)-(b). While that review was ongoing, the Revoked Order suspended for 90 days entry of foreign nationals of the seven countries already identified as posing heightened terrorism-related concerns in the context of the Visa Waiver Program. *Id.* §3(c). It authorized the Secretaries, however, to make case-by-case exceptions to the suspension. *Id.* §3(g).

The Revoked Order similarly directed a review of the Refugee Program, and, pending that review, suspended admission under the Program for 120 days, subject to case-by-case waivers. Revoked Order §5(a). In addition, it sought to assist victims of religious persecution by directing agencies to prioritize refugee claims premised on religious-based persecution, provided the religion at issue was "a minority religion in the individual's country of nationality." *Id.* §5(b).

## III. Litigation Challenging the Revoked Order

The Revoked Order was challenged in multiple courts. In this Court, certain aliens denied

entry to the United States at Dulles Airport initiated litigation, in which the Commonwealth of Virginia subsequently intervened. *See generally Aziz v. Trump*, No. 1:17-cv-116 (LMB/TCB), --- F. Supp. 3d ---, 2017 WL 580855, (Feb. 13, 2017). Alleging that the Revoked Order violated the Establishment Clause, Virginia then sought to enjoin the Revoked Order, identifying 350 students attending state universities and faculty members for whom the Revoked Order "affects international travel," and an estimated "$20.8 million in lost tuition and fees" to the institutions . *Id.* at *2-*3. A judge of this Court then found that Virginia had standing, had satisfied the four-part test for a preliminary injunction set forth in *Winter v. NRDC*, 555 U.S. 7, 20 (2008), and enjoined the 90-day suspension of entry as to any "person who has a Virginia residence or is employed by or attends an educational institution administered by [] Virginia" *and* is an LPR or valid visa holder. *Id.* at *11. A district court in the Ninth Circuit, meanwhile, enjoined the same provision nationwide, along with the refugee provisions of § 5 of the Revoked Order, and a panel of the Ninth Circuit declined to stay the injunction pending appeal. *See Wash. v. Trump*, 2017 WL 462040 (W.D. Wash. Feb. 3, 2017); *Wash. v. Trump*, 847 F.3d 1151, 1156 (9th Cir. 2017) (per curiam). After issuance of the Order, the Ninth Circuit denied rehearing en banc to consider vacatur; a published dissent joined by 5 judges, however, observed that the panel's holding "is simply irreconcilable" with Supreme Court precedent and therefore would have stayed the district court's TRO and subsequently vacated the panel opinion. *Wash.* v. *Trump*, ---F.3d---, 2017 WL 992527 at *6, *7, *9 (9th Cir. Mar. 15, 2017) (Bybee, J.). ("*9th Cir. Mar. 15 Dissent*").

**IV. The Order**.

In *Washington*, the Ninth Circuit invited the "political branches" to act, "as far better equipped" than courts to revise the Revoked Order. 847 F.3d 1167. Responding to this judicial invitation, on March 6, 2017—at the joint urging of the Attorney General and Secretary of Homeland Security[4]—the President issued the Order, which revoked the Revoked Order, and replaced it with substantially

[4] Joint Ltr. to President (Mar. 6, 2017),https://www.dhs.gov/sites/default/files/publications/17_0306_S1_DHS-DOJ-POTUS-letter_0.pdf

revised provisions that address the concerns raised by judges of this and other courts. In addition, the President narrowed the scope of the temporary suspension on travel to six countries, excluding Iraq.

**A. The Order's Temporary Entry Suspension**

The Order's central, explicit purpose is to enable the President and his Administration to assess whether current screening and vetting procedures are sufficient to detect terrorists seeking to enter the Nation. Order §1(f). To facilitate that important review, the President ordered a temporary, 90-day pause on entry of certain foreign nationals from six nations previously "identified as presenting heightened concerns about terrorism and travel to the United States" by Congress or the prior Administration: Iran, Libya, Somalia, Sudan, Syria, and Yemen. *Id.* §1(a), (d)-(f). The Order excludes Iraq from the temporary suspension on travel, noting that "the Iraqi government has expressly undertaken steps to enhance travel documentation, information sharing, and the return of Iraqi nationals subject to final orders of removal" since the Executive issued the Revoked Order. *Id.* § 1(g). In response to the judicial rulings, moreover, the Order provides that the suspension applies only to aliens who: (1) are outside the United States on the Order's effective date, (2) do not have a valid visa on that date, and (3) did not have a valid visa on the effective date of the Revoked Order. Order §3(a). It expressly excludes other categories of aliens that concerned courts, including any LPR, any foreign national admitted to or paroled into the United States, and any foreign national granted asylum, any refugee already admitted to the United States, or any person granted certain protections from removal. *See id.* §3(b). Consequently, an alien who is in the U.S. on the Order's effective date (for example, on a single-entry visa, Mot. at 15) and leaves will not be subject to the Order's temporary suspension in seeking a new visa or upon return; instead, he will be subject to pre-existing rules governing admission.

The Order also explains that each of the six countries "is a state sponsor of terrorism, has been significantly compromised by terrorist organizations, or contains active conflict zones," which is why Congress and DHS previously designated them "countries of concern." *Id.* §1(b)(1); (d). The

Order details the circumstances of each country that give rise to "heightened risk[s]" that terrorists from those countries would attempt to enter the United States and that those countries' governments may lack the "willingness or ability to share or validate important information about individuals seeking to travel to the United States" to screen them properly. Order §1(d)-(e).

### B. The Order's Waiver Provision

The order permits consular officers to grant case-by-case waivers to § 3 where denying entry "would cause undue hardship" and "entry would not pose a threat to national security and would be in the national interest." Order § 3(c). Moreover, it lists circumstances where waivers could be considered, including for (among others):

- foreign nationals previously "admitted to the United States for a continuous period of work, study, or other long-term activity," but who are currently outside the U.S. and seeking to reenter;
- individuals who seek entry for "significant business or professional obligations and the denial of entry would impair those obligations"; and
- individuals who seek entry "to visit or reside with a close family member (e.g., a spouse, child, or parent) who is a [U.S.] citizen, [LPR], or alien lawfully admitted on a valid nonimmigrant visa."

*Id.* These provisions expand significantly on the Revoked Order's waiver provisions. The Order also specifies that requests for waivers will be processed "as part of the visa issuance process." Order §3(c); *see also* DHS, Q&*A: Protecting the Nation from Foreign Terrorist Entry* … (Mar. 6, 2017));[5] U.S. Dep't of State, Executive Order on Visas (Mar. 6, 2017).[6] Consular officers reviewing visa applications from otherwise-eligible applicants will carefully review each request under these criteria and may consider other appropriate circumstances that are not enumerated in the Order.[7]

---

[5] https://www.dhs.gov/news/2017/03/06/qa-protecting-nation-foreign-terrorist-entryunited-states

[6] *See* https:/travel.state.gov/content/travel/en/news/important-announcement.html (as revised).

[7] The Order contains a number of other provisions, which plaintiffs do not discuss in their TRO motion, even though a moving party must "demonstrate[], with respect to each claim, that they will suffer irreparable harm in the absence of an injunction." *N. Am. Med. Corp. v. Axiom Worldwide, Inc.*, 522 F.3d 1211, 1226 (11th Cir. 2008). Significantly, the Order directs an immediate review of the

### V. Litigation Concerning the Order.

In the District of Hawaii, the State of Hawaii and an American citizen challenged the Order and the Court entered a nationwide TRO as to sections 2 and 6 of the Order. That court found that the citizen, Dr. Elshikh, had standing to bring an Establishment Clause claim based on "official condemnation" of his religious views, the "deeply sadden[ing]" effect on him, and his statement that he "will not be able to associate as freely with those of other faiths." *Haw. v. Trump*, 2017 WL 1011673, at *9-*10 (D. Haw. Mar. 15, 2017). The Court then concluded that, under Ninth Circuit case law, it would credit campaign-related statements made by the President and his advisers as relevant "historical background" for the Order, and found a likelihood of success on the merits. *Id.* at *13-*16.

In the District of Maryland, six individuals and three refugee organizations challenged the Order and the Court entered a nationwide preliminary injunction as to section 2(c) of the Order. *Int'l Refugee Assist. Proj.* ("*IRAP*") *v. Trump*, 2017 WL 1018235 (D. Md. Mar. 16, 2017). That Court held that several individual plaintiffs had standing to bring claims, and that those plaintiffs were likely to succeed on their Establishment Clause claims, and also held that Section 1182(f) permitted the President to bar entry, but not immigrant visa issuance, based on nationality.

## STANDARD OF REVIEW

"The standard for granting either a TRO or a preliminary injunction is the same." *Moore v. Kempthorne*, 464 F. Supp. 2d 519, 525 (E.D. Va. 2006). Both "are extraordinary remedies involving the exercise of very far-reaching power to be granted only sparingly and in limited circumstances." *MicroStrategy Inc. v. Motorola*, 245 F.3d 335, 339 (4th Cir. 2001). The movant "must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary

---

Refugee Program's processes to determine "what additional procedures should be used to ensure that individuals seeking admission as refugees do not pose a threat" to the country. Order §6(a). To facilitate that review, the Order suspends Refugee Program travel for 120 days, noting that "[t]errorist groups have sought to infiltrate severeal nations through refugee programs." *Id.* §1(b)(iii). Unlike the Revoked Order, the Order does not prioritize refugee claims based on persecution against religious minorities. *Compare* Revoked Order at § 5(b).

relief, that the balance of equities tips in [its] favor, and that [a TRO] is in the public interest." *Winter*, 555 U.S. at 20. The movant bears the burden as to all "four requirements, each of which must be satisfied." *Real Truth About Obama v. FEC*, 575 F.3d 342, 345-47 (4th Cir. 2009) (reinstated in relevant part after vacatur, 607 F.3d 355). Injunctive relief that "deeply intrudes into the core concerns of the executive branch"—including foreign affairs and national security—may be awarded only upon "an extraordinarily strong showing" on each element. *Adams v. Vance*, 570 F.2d 950, 954- (D.C. Cir. 1978).

"Facial challenges are disfavored" compared to as-applied challenges. *Wash. State Grange v. Wash. State Repub. Party*, 552 U.S. 442, 450-51 (2008). They are thus "the most difficult challenge[s] to mount successfully." *U.S. v. Salerno*, 481 U.S. 739, 745 (1987). Plaintiffs bear a "heavy burden" to show "that no set of circumstances exists under which the [Order] would be valid." *Id.*; *U.S. v. Comstock*, 627 F.3d 513, 518 (4th Cir. 2010) (facial challenge must fail "if a statute has a plainly legitimate sweep").

## ARGUMENT

Plaintiffs do not come close to meeting their extraordinary burden. At the outset, they present no imminent, irreparable harm that requires emergency relief; and indeed, no concrete, non-speculative injury that would satisfy Article III's justiciability requirements at all. Moreover, plaintiffs' claims fail on the merits. The Order falls well within the President's statutory authority, applies only to individuals outside the country who do not have a valid visa, includes no religious preference, and includes the national security rationales identified by this Court in *Aziz* as lacking in the Revoked Order. Plaintiffs are therefore not entitled to the sweeping relief they seek.

### I. Plaintiffs Do Not Allege Any Harm That Requires Emergency Relief.

To secure a TRO or preliminary injunction, plaintiffs must show "irreparable harm" absent such relief. *Winter*, 555 U.S. at 20. Such harm must be "neither remote nor speculative, but actual and imminent." *Direx Israel v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991). The irreparable harm standard "erects a very high bar for a movant," *Henke v. Dep't of Interior*, 842 F. Supp. 2d 54, 59

(D.D.C. 2012), with a threshold well above the injury required for Article III standing. *See, e.g., Taylor v. Res. Tr. Corp.*, 56 F.3d 1497, 1508, amended, 66 F.3d 1226 (D.C. Cir. 1995); *Assoc. Gen. Contractors of Cal., Inc. v. Coal. For Econ. Equity*, 950 F.2d 1401, 1410 (9th Cir. 1991).

**A. Plaintiffs Have Not Alleged Irreparable Harm Related To Visas or Entries.**

Three of the plaintiffs who allege harm stemming from the visa process do so in an apparent misunderstanding of the Order. John Does #2 and #3 both allege that they are students present in the United States on a valid visa, and then allege harms related to a future entry to the United States or future visa renewal. But the Order is explicit: the temporary suspension of entry "shall apply only to [those] who [] are *outside the United States*" or "*do not have* a valid visa." Order § 3(a) (emphasis added). Individuals who are not subject to the temporary suspension of entry would continue not be subject to it even after they depart the U.S. or their visa expires. John Doe #5, meanwhile, rests his allegations on a pending marriage petition for his wife, who "has Sudanese citizenship through her parents although she has never lived in Sudan." FAC ¶ 43, ECF No. 11. From this allegation, it appears John Doe #5's wife is also outside the scope of the Order's suspension of entry, which exempts "dual national[s]" traveling on a non-designated country's passport, *see* Order § 3(b)(iv), such as a person whose only link to one of the six countries is inherited citizenship.[8] Plaintiffs, John Does #2, #3, and #5 have therefore failed to identify any visas even covered by the Order.

Three other plaintiffs who alleged visa or entry-related harms all fail to allege that such harms are actual, imminent, and would be expected to occur within the period of temporary, emergency relief. Plaintiff Elkarra vaguely alleges that his "Syrian in-laws" will be unable to visit him in the United States, but there is no suggestion that they have plans to travel within the pendency of the Order's

[8] Even if John Doe #5's wife presents a passport of one of the six countries, action on her petition is not imminent. Based on the Apr. 2017 Visa Bulletin (the document produced by the Dept. of State to indicate visa availability), visa numbers in the second preference family category (applicable to LPRs) are available to those with priority dates before June 8, 2015, so even if her petition was approved today, there is a likely wait of several months before she could even apply for an immigrant visa.

temporary, 90-day suspension period. Plaintiffs Ayloush and Soltani likewise make vague allegations about unspecified "family in Iran" and Syria who are unable to visit. Such allegations are insufficient because "[s]uch 'some day' intentions—without any description of concrete plans, or … any specification of when the some day will be—do not support a finding of the 'actual or imminent' injury" required for standing, let alone the higher standard for irreparable harm. *Friends for Ferrell Pkwy. v. Stasko*, 282 F.3d 315, 322 (4th Cir. 2002) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992)).

Nor can the remaining three plaintiffs who assert claims based on marriage petitions for their spouses, establish they are likely to suffer imminent, irreparable harm. John Does #6 and #7 allege that that they have filed marriage petitions for their wives and that those are pending, but they acknowledge that the Order will not apply to their wives until some indefinite date in the future, if "their marriage petitions are approved." [9] Mot. at 7. Of course, their marriage petitions may not, and may never be, approved, based on pre-Order standards that remain unchanged. Any injury is therefore neither actual nor imminent, and does not meet the requirements for irreparable harm. Moreover, courts have concluded that there is no standing based on the purported injury of a delay in visa decision-making. *See, e.g., Catholic Charities CYO v. Chertoff*, 622 F. Supp. 2d 865, 878-80 (N.D. Cal. 2008), *aff'd* 368 F. Appx. 750 (holding no standing and that claims were unripe); *Kodra v. Sec'y*, 903 F. Supp. 2d 1323, 1327 (M.D. Fla. 2012) (no standing to challenge delay of visa determination).

John Doe #8 asserts that his marriage petition for his wife has been approved, and he claims that her visa application will be "subject to a more onerous application process." Mot. at 7. But that

[9] USCIS processing times for I-130 petitions vary by the service center to which it is assigned, with a current average wait time of 5-7 months before processing. *See* https://egov.uscis.gov/cris/processTimesDisplayInit.do. Thus, John Does #6 and 7 can reasonably face a wait of several more months before their wives could even apply for immigrant visas, the preprocessing and processing of which will take additional months. John Doe #7's allegations in the Motion also contradict those in the Complaint in which he alleged that he "is married to a United States Citizen" (the First Amended Complaint makes no allegation of a pending petition). *See* ECF No. 1 at ¶ 33; *compare Johnston v. Crawford*, 2005 WL 6119881, at *4 (E.D. Mo. Aug. 26, 2005) ("Even by the lenient standards of federal notice pleading [before *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)], this claim is not pled in the complaint and is not properly asserted for the first time in the motion for a TRO.")

claim of harm ignores the waiver process. The Order specifically identifies circumstances like these as an example of where a waiver may be appropriate: a person who "seeks to enter the United States to . . . reside with . . . a spouse." Order § 3(c)(iv). Contrary to his claims that seeking a waiver will be "onerous," the Order integrates the grant of a waiver into the pre-existing consular visa interview process, as recently explained in further detail by the State Department:

> We do not plan to cancel any previously scheduled visa appointments. After the new Executive Order goes into effect, any individual who believes he or she is eligible for a waiver or exemption should apply for a visa and disclose during the visa interview any information that might qualify the individual for a waiver/exemption.

State Dep't Alert (Mar. 6, 2017), https://travel.state.gov/content/travel/en/news/important-announcement.html. This integrated waiver process thus imposes no "delay" on John Doe #8's family "reunification", contrary to the finding of the *IRAP* court. 2017 WL 1018235 at *7. In sum, none of the plaintiffs can identify an actual or imminent harm that will occur through the visa or entry process.

**B. Plaintiffs Have Not Alleged Any Other Form of Irreparable Harm**.

Aside from the facially-inadequate harms to visas and admissions described above, plaintiffs' remaining allegation of irreparable harm is that they will suffer a "stigmatic injury," Mot. at 12-13, and that such injury is "unquestionably" irreparable. Mot. at 9 (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). But plaintiffs' perfunctory reliance on case law finding Establishment Clause injuries to be irreparable is of no avail here, because Plaintiffs have failed to describe an Establishment Clause harm sufficient for Article III standing, let alone an irreparable harm that would require emergency relief.

Courts have been clear that these types of "allegations of stigmatic injury will not suffice to link a plaintiff personally to the conduct he challenges unless . . . the plaintiff personally has been denied a benefit," *Kurtz v. Baker*, 829 F.2d 1133, 1141 (D.C. Cir. 1987), and such allegations, thus, cannot form the basis for standing or irreparable harm. Rather, a government action that is alleged to confer "outsider status" must also directly impose "personal . . . claimed injuries [] traceable to the Defendants." *Newdow v. Lefevre*, 598 F.3d 638, 643 (9th Cir. 2010) ("an 'abstract stigmatic injury'

resulting from such outsider status is insufficient to confer standing" (quoting *Allen v. Wright*, 468 U.S. 737, 755–56 (1984)).[10] This principle, that standing requires stigmatic injury *plus* something more is reflected in *Moss v. Spartanburg Cty. Dist. 7*, the Fourth Circuit opinion on which plaintiffs rely. *See* 683 F.3d 599, 607 (4th Cir. 2012). There, the Court of Appeals identified standing for a plaintiff family who alleged "outsider" status *and* that they had personally received a letter from their school district promoting a "course of religious education [with] Christian content," *and* "prayers and other Christian references [at] school events," *and* that this forced them to change their conduct to avoid encounters with their school.[11] *Id.* The allegations beyond "stigmatic injury" that plaintiffs describe do not meet these standards: a plaintiff's own choice to, *e.g.*, appear "on national media outlets," to describe their faith, Mot. at 6, is not equivalent to official action "den[ying] a benefit," *Kurtz*, 829 F.2d at 1141, or "forc[ing] him repeatedly to encounter a religious belief he finds offensive." *Newdow*, 598 F.3d at 642.[12]

Nor can plaintiffs demonstrate irreparable harm by asserting that they have engaged in "assist[ance] and advoc[acy] on behalf of" individuals affected by the Revoked Order or by describing "their religion as a religion of peace on national media outlets." Mot. at 6. Plaintiffs' own decisions about how to spend their time in assistance, religious advocacy, and media appearances are their "own

---

[10] Although the Government believes the determination that Dr. Elshikh in *Hawaii v. Trump* has standing is in error, it is also distinguishable from plaintiffs' claims here. The Court in *Hawaii* applied Ninth Circuit precedent holding that "outsider status" *plus* a "chill[ing]" of "participation in the political community" satisfied Article III. *See Hawaii* at *10 (quoting *Catholic League v. S.F.*, 624 F.3d 1043 (9th Cir. 2010)). The Government likewise disagrees with the finding of standing for an Establishment Clause claim in the *IRAP* case, but even those plaintiffs pleaded personalized allegations of harm in excess of the plaintiffs here. *See IRAP* at 16-17 (relying on, *e.g.*, *IRAP* plaintiffs' "worries [about] safe[ty] in this country").

[11] In *Cooper v. USPS*, 577 F.3d 479, 489 (2d Cir. 2009), plaintiff likewise received a direct religious message as the government directly provided him a service. And in *Engel v. Vitale*, 370 U.S. 421 (1962), the plaintiffs' children were directly subject to in-class, state-sponsored prayers.

[12] Here, too, plaintiffs' allegation that this harm was "ongoing," notwithstanding the nationwide injunction entered regarding the Revoked Order, is an indicator that plaintiffs' allegations of "psychological and spiritual" injury are in fact those caused by "passionate disagreement premised on Establishment Clause principles" rather than "'direct' and 'unwelcome' contact with an alleged religious establishment within their community." *Moss*, 683 F.3d at 605. Such abstract disagreement with policies does not satisfy the high bar for irreparable harm.

decisions . . . and, therefore, [] indirect, self-inflicted, and not irreparable harm." *Safari Club Int'l v. Jewell*, 47 F. Supp. 3d 29, 36 (D.D.C. 2014) (citing Penn. v. N.J., 426 U.S. 660, 664 (1976)). In short, none of plaintiffs' claims meet the extraordinary threshold required for emergency relief.

**II. Plaintiffs Do Not Clearly Demonstrate They Are Likely to Succeed on the Merits.**

"[A] party seeking a preliminary injunction . . . must clearly show that it is likely to succeed on the merits." *Dewhurst v. Century Alum. Co.*, 649 F.3d 287, 290 (4th Cir. 2011). This "requirement that the plaintiff clearly demonstrate that it will likely succeed on the merits is far stricter than" a "requirement that the plaintiff demonstrate only a grave or serious question for litigation." *Real Truth*, 575 F.3d at 347. Here, plaintiffs fail in multiple respects to demonstrate a clear likelihood of success.

**A. Plaintiffs' Challenges to the Order Are Not Justiciable**.

All of plaintiffs' claims fail because they lack Article III standing or because their claims are not yet ripe. To have the standing required to satisfy Article III's "case" or "controversy" requirement, Plaintiffs must demonstrate a "legally and judicially cognizable" injury. *Raines v. Byrd*, 521 U.S. 811, 819 (1997). At a minimum, this consists of a "concrete and particularized" injury caused by the Order that is "actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560-61. For the same reasons explained above, they have not shown injury-in-fact here. *See supra* Part I. Article III is not satisfied by an "abstract, stigmatic injury" without accompanying personal injuries directly traceable to the Defendants. *See Kurtz*, 829 F.2d 1141; *Newdow* 598 F.3d 643. The "some day" allegations of plaintiffs that they wish to have family visit from abroad, the speculation about future processing of visa applications (a stage in the admissions process only one plaintiff's spouse has even reached), and plaintiffs' own choices to engage in religious advocacy and outreach do not satisfy this standard. Nor can plaintiffs rely by analogy on equal protection cases, as they seek to do, *see* Mot. at 13-14 because the Fourth Circuit has established that "constraints of rationality imposed by the constitutional requirement of substantive due process and of nondiscrimination exacted by the equal protection

component of the due process clause do not limit the federal government's power to regulate either immigration or naturalization." *Appiah v. INS*, 202 F.3d 704, 710 (4th Cir. 2000).

In addition, plaintiffs' visa and admission related claims are not yet ripe. "The doctrine[] of... ripeness . . . originate[s] in Article III's 'case' or 'controversy' language, no less than standing does." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006). Ripeness ensures that courts "avoid[] … premature adjudication," particularly where future decisions or factual evolution may obviate the need for judicial relief or alter the character of the controversy. *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 807-08 (2003). To avoid dismissal for lack of ripeness, plaintiff must show that "postponing review [] impose[s] a hardship . . . that is immediate, direct, and significant." *W.V. Highlands Conserv. v. Babbitt*, 161 F.3d 797, 801 (4th Cir. 1998). Here, for the reasons discussed above—plaintiffs' marriage petitions have not yet been approved; plaintiffs' family members have not yet applied for visas; visa interviews have not yet been scheduled; plaintiffs' family members may be eligible for waivers—there is no hardship that is yet "immediate" or "direct," nor is it likely there will be one within the 90-day suspension period in the Order.

Plaintiffs' claims are also barred by the doctrine of consular nonreviewability, under which the denial of a visa to an alien abroad is not subject to judicial review. *See Brownell v. We Shung*, 352 U.S. 180, 184 n.3, 185 n.6 (1956); *Saavedra Bruno v. Albright*, 197 F.3d 1153, 1158-59 & n.2 (D.C. Cir. 1999). As another judge of this court has explained, "courts have consistently held that a consular officer's decision to grant or deny a visa is not subject to judicial or administrative review [and] [i]mportantly, the doctrine of nonreviewability of consular officers' visa determinations is essentially without exception." *Romero v. Consulate*, 860 F. Supp. 319, 322 (E.D. Va. 1994). Some courts of appeals have recognized a "limited exception to the doctrine of consular nonreviewability where a U.S. citizen asserts a violation of a constitutional right." *Adeyemo v. Kerry*, 2013 WL 498169, at *2 (D. Md. Feb. 7, 2013), *aff'd* 546 F. App'x. 187 (4th Cir. 2013). But "[t]he Fourth Circuit has not addressed the issue,"

*id.*, and adopting this exception for nationality-based classifications would be particularly inappropriate because "classifications on the basis of nationality are frequently unavoidable in immigration matters." *Rajah v. Mukasey*, 544 F.3d 427, 435 (2d Cir. 2008).

**B. The Order is a Valid Exercise of the President's Authority**.

In any event, plaintiffs' challenges to the Order are not likely to succeed on the merits. The Order's temporary suspension of entry of certain classes of aliens during a review of the Nation's screening and vetting procedures is a valid exercise of the President's broad statutory authority to "suspend the entry of all aliens or of any class of aliens" (Sec. 1182(f)) and to prescribe the terms on which aliens may enter (Sec. 1185(a)(1)). And it is completely neutral with respect to religion.

**1. The Order falls squarely within the President's broad authority under Sections 1182(f) and 1185(a).**

"'[T]he power to exclude aliens is inherent in sovereignty, necessary for maintaining normal international relations and defending the country against foreign encroachments and dangers—a power to be exercised exclusively by the political branches.'" *Kleindienst v. Mandel*, 408 U.S. 753, 765 (1972). "Distinctions on the basis of nationality may be drawn in the immigration field by the Congress or the Executive." *Narenji v. Civilette*, 617 F.2d 745, 747 (D.C. Cir. 1979) ("So long as such distinctions are not wholly irrational they must be sustained"); *cf. Malek-Marzban v. INS*, 653 F.2d 113, 116 (4th Cir. 1981) ("When the federal government classifies aliens on the basis of nationality, the classification must be sustained if it has a rational basis.... The United States is not bound to treat the nationals of unfriendly powers [] the same [as] friendly powers"). Here, Congress has conferred expansive authority on the President, including in two statutory provisions that the Order expressly invokes. Order §2(c).

First, Section 1182(f) provides that "[w]henever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or of any class of aliens as immigrants or nonimmigrants," or "impose on the entry of aliens

any restrictions he deems to be appropriate." "The President's sweeping proclamation power [under Section 1182(f)] provides a safeguard against the danger posed by any particular case or class of cases that is not covered by one of the [inadmissibility] categories in section 1182(a)." *Abourezk v. Reagan*, 785 F.2d 1043, 1049 n.2 (D.C. Cir. 1986), *aff'd*, 484 U.S. 1 (1987). Every President over the last thirty years has invoked that authority to suspend or restrict entry of certain classes of aliens.[13]

Second, Section 1185(a) broadly authorizes the "President" to "prescribe" reasonable "rules, regulations, and orders," and "limitations and exceptions" regarding entry of aliens. That provision is the latest in a line of statutory grants of authority tracing back nearly a century. *See* Pub. L. No. 65-154, §1(a), 40 Stat. 559 (1918). Originally limited to times of war or declared national emergency, Congress removed that limitation in 1978, when it enacted Section 1185(a) in its current form. Pub. L. 95-426, §707(a), 92 Stat. 963, 992-93 (1978).

Both of those provisions comfortably encompass the Order's temporary suspension of entry of aliens from six countries that the President—in consultation with the Attorney General and the Secretaries of State and Homeland Security—concluded required special precautions while the review of existing screening and vetting protocols is completed. That temporary measure is a paradigmatic exercise of the President's authority to "suspend the entry" of "any class of aliens" he finds may be "detrimental to the interests of the United States," 8 U.S.C. §1182(f), and to prescribe reasonable "limitations" on entry, id. §1185(a)(1).

**2. Section 1152 does not prevent the President from suspending the entry of nationals from the designated foreign countries.**

Plaintiffs first contend that Section 1152(a)(1)(A), which prohibits discrimination on the basis

[13] *See, e.g.*, Presidential Proclamation ("Procl.") 5517 (1986) (Reagan; Cuban nationals); E.O. 12,807 (1992) (George H.W. Bush; government officials who impeded anti-human-trafficking efforts); Procl. 8342 (2009) (George W. Bush; same); Procl. 6958 (1996) (Clinton; Sudanese government officials and armed forces); Procl. 8693 (2011) (Obama; aliens subject to U.N. Security Council travel bans). Plaintiffs contend that these actions did not "utilize[] this section in the manner done here," Mot. at 27, but provide no further analysis. In fact, these examples are closely akin to the Order, relying on section 1182(f) to prevent entry of aliens partly or entirely based on nationality.

of nationality in the allocation of immigrant visas, bars the President from drawing nationality-based distinctions under Sections 1182(f) and 1185(a). Plaintiffs are wrong, and even if they were correct, it would not justify the broad relief plaintiffs seek because 8 U.S.C. § 1152(a)(1)(A) applies only to aliens seeking "immigrant" visas. *Id.*; *see IRAP* at 20-24 ("the statutory language makes clear" that 1152(a) is so limited).[14] Most of the aliens plaintiffs claim will be affected by the Order—students, employees, tourists, and family visiting relatives, like the family members of plaintiffs Ayloush and Elkarra—would seek to enter on nonimmigrant visas, and thus are not covered by Section 1152(a)(1)(A). Nor does the section apply to those entering under the Refugee Program, who do not receive visas.[15] *See* 8 U.S.C. §1181(c). Plaintiffs thus cannot meet the "heavy burden" of the "no set of circumstances" or "plainly legitimate sweep" tests required by a facial challenge. *Comstock*, 627 F.3d 518. Rather, even if their reading of 1152(a)(1)(A) were correct, the Order would still be valid in most applications.

In any event, plaintiffs' statutory argument is wrong. Section 1152(a)(1)(A)—enacted in 1965 to abolish the prior system of nationality-based quotas—governs only "the issuance of an immigrant visa" in the ordinary process of visas and admissions. It does not purport to, and has never been interpreted to restrict, the President's longstanding authority to suspend entry of "any class of aliens" or to prescribe reasonable "rules, regulations, and orders" regarding entry. 8 U.S.C. §§ 1182(f), 1185(a)(1). For example, President Reagan invoked Section 1182(f) to "suspend entry into the United States as immigrants by all Cuban nationals," subject to exceptions. Proclam. No. 5517 (1986).[16] And

[14] The vast majority—more than 70%—of visas issued in the last two fiscal years to nationals of the six countries at issue were nonimmigrant visas. *See* https://travel.state.gov/content/visas/en /law-and-policy/statistics/annual-reports/ report-of-the-visa-office-2016.html; https://travel.state.gov/content/visas/en/law-and-policy/statistics/annual-reports/report-of-the-visa-office-2015.html.

[15] Even where Section 1152(a)(1)(A) applies, Congress made clear that it does not "limit the authority of the Secretary of State to determine the procedures for [] processing [] immigrant visa applications," id. §1152(a)(1)(B), which at most is all the Order's temporary pause does.

[16] *See also* Procl. 6958 (1996) (members of Sudanese government and military); Procl. 5829 (1988) (certain Panamanian persons); Procl. 5887 (1988) (Nicaragua government officials and employees).

the Supreme Court deemed it "perfectly clear that [Section 1182(f)] grants the President ample power to use a naval blockade [to] simply deny … Haitian migrants the ability to disembark on our shores." *Sale v. Haitian Ctrs. Council*, 509 U.S. 155, 187 (1993).

Section 1185(a), too, has long been understood to authorize nationality-based distinctions. In 1979, the Office of Legal Counsel construed it as authorizing the President to "declare that the admission of Iranians or certain classes of Iranians would be detrimental to the interests of the United States," Immigration Laws and Iranian Students, 4A Op. O.L.C. 133, 140 (Nov. 11, 1979), and President Carter invoked that section two weeks later. E.O. 12,172 (1979). Plaintiffs are thus simply wrong to assert that past Presidents have not drawn nationality-based distinctions in administering the immigration laws. *Compare* Mot. at 27, *with Narenji*, 617 F.2d at 746-48 (upholding requirement that nonimmigrant-alien students who were Iranian nationals to inform INS about residence and status).

These examples illustrate that limiting the entry of nationals of particular countries can be critical to the President's ability to conduct the Nation's foreign affairs and protect its security, yet plaintiffs' statutory interpretation would upset the long-settled understanding of presidential authority that "distinctions on the basis of nationality may be drawn in [] immigration," *Narenji*, 617 F.2d at 747, thereby disabling the President from restricting entry of immigrants from any country—even one with which the nation was on the verge of war. As the Second Circuit held in *Rajah*, "given the importance to immigration law of, *inter alia*, national citizenship, passports, treaties, and relations between nations, the use of such classifications is commonplace and almost inevitable." 544 F.3d at 435.

Plaintiffs also contend that Section 1152(a)(1)(A) overrides the President's Section 1182(f) authority because it "became law in 1965," after 1182(f). Mot. at 27. But plaintiffs have it backwards: to read Section 1152(a)(1)(A) as narrowing Section 1182(f) would be to treat it as a partial "'repeal[] by implication,'" which courts will not do unless Congress's "'intention'" is "'clear and manifest.'" *Nat'l Ass'n of Home Builders v. Defs. of Wildlife* (*NAHB*), 551 U.S. 644, 662, 664 n.8 (2007). Sections

1152(a)(1)(A) and 1182(f) can best be reconciled by sensibly reading Section 1152(a)(1)(A)'s general, default provisions as not affecting the President's authority under Section 1182(f) to suspend entry based on a specific finding of national interest. *See RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 132 S. Ct. 2065, 2070-71 (2012) ("'[I]t is a commonplace of statutory construction that the specific governs the general.'").[17]

### 3. Section 1182(a) does not prevent the President from suspending the entry of nationals from the designated countries

Plaintiffs also contend that the Order's suspension of entry exceeds the President's Section 1182(f) authority because the suspension is based on terrorism concerns, and Congress has already set forth criteria for denying admission on terrorism-related grounds in Section 1182(a)(3)(B). *See* Mot. at 28. Plaintiffs' argument unpersuasively assumes that the President may not exercise his Section 1182(f) authority based on any general concern that also overlaps with one of Section 1182(a)'s many specific grounds for inadmissibility. That cramped understanding of Section 1182(f) contravenes the text and structure of the statute as well as decades of practice. Section 1182(a) sets forth numerous specific grounds of inadmissibility, including grounds relating to "[h]ealth[]," "[c]riminal" history, "[s]ecurity," and "[f]oreign policy." 8 U.S.C. § 1182(a)(1), (2), (3), (3)(C). Recognizing that specific statutory criteria cannot anticipate every threat to national interests, Section 1182(f) supplements those criteria by granting the President broad authority to "suspend the entry" of additional aliens or classes of aliens, and nothing in Section 1182(f)'s text suggests the President cannot exercise that authority in response to concerns that overlap with one of Section 1182(a)'s inadmissibility grounds.

Experience confirms that Section 1182(f) is not confined to topics on which Section 1182(a) is silent. For example, Congress identified certain crimes that render aliens inadmissible, 8 U.S.C. §

[17] Furthermore, even if Section 1152(a)(1)(A) could be construed to narrow Section 1182(f), it cannot be read to narrow Section 1185(a)—which was amended and expanded in 1978, after Section 1152(a)(1)(A)'s enactment. Nothing in Section 1185(a)'s current text or post-1978 history limits the President's authority to restrict entry by nationals of particular countries.

1182(a)(2), yet Presidents have invoked Section 1182(f) to suspend the entry of aliens who committed criminal offenses.[18] Similarly, Section 1182(a) renders inadmissible aliens who have participated in certain human-rights violations, including "genocide," "torture," and "extrajudicial killing," 8 U.S.C. §1182(a)(3)(E)(ii)-(iii), yet presidents have invoked Section 1182(f) to suspend entry of aliens linked to other human-rights abuses.[19] More broadly, Section 1182(a)(3)(C) deems an alien inadmissible to prevent "potentially serious adverse foreign policy consequences." Yet numerous invocations of Section 1182(f) have addressed foreign policy and reflected the President's determination that "it is in the foreign policy interests of the United States to suspend [] entry" of the affected aliens. *See, e.g.*, Procl. 7062 (Jan. 14, 1998).[20] So, too, Section 1182(a)(3)(B)'s exclusion of certain aliens on terrorism-related grounds does not impliedly bar the President from temporarily suspending certain entries to assess whether existing procedures are adequate to detect potential terrorists.

**4. The Order Does Not Discriminate on the Basis of Religion**.

The Order does not discriminate on the basis of religion.[21] It applies to six countries that Congress and the prior Administration determined posed special risks of terrorism. It applies to certain nationals of those countries, regardless of religion. And it excludes numerous individuals who fall outside the scope of the Order based on its religiously-neutral exclusions or are entitled to a waiver, again based on neutral criteria. Plaintiffs nevertheless try to impugn the Order using campaign statements. As the Supreme Court has made clear, official action must be adjudged by its "'text, legislative history, and implementation of the statute or comparable official act[ion],'" not through "judicial psychoanalysis of a drafter's heart of hearts." *McCreary Cty. v. ACLU of Ky.*, 545 U.S. 844,

[18] *E.g.,* E.O. 13,694 (2015); Procl. No. 7750 (2004).

[19] *E.g.,* E.O. 13,692 (2015); E.O. 13,606 (2012); Procl. No. 8697 (2011); Procl. No. 8015 (2006).

[20] *See also, e.g.,* Procl. No. 7060 (1997); E.O. 13,726, (2017); E.O. 13,712 (2015); E.O. 13,687 (2015).

[21] As noted, unlike the Revoked Order, the Order contains no prioritization in refugee admissions of refugee claims based on religious-minority persecution.

862 (2005) (quoting *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 308 (2000)). Measured against these standards, the Order falls well within the President's lawful authority.

**a. The Order Draws Distinctions on the Basis of Risk, not Religion.**

The Order's temporary suspensions are expressly premised on the President's finding that a temporary pause in entry was necessary to "prevent infiltration by foreign terrorists" while the review of screening and vetting procedures is ongoing. Order §2(c). As the Order explains, the six countries covered were previously designated by Congress and the Executive Branch as presenting particular risks, and the risk of continued entry from those countries during the review was, in the President's view, unacceptably high. The lengthy reasoning provided in Section 1 of the Order goes beyond the constitutional requirement set by *Mandel* of a "facially legitimate" reason, 408 U.S. at 770; as the Supreme Court has explained: "[t]he Executive should not have to disclose its 'real' reasons for deeming nationals of a particular country a special threat—or indeed for simply wishing to antagonize a particular foreign country by focusing on that country's nationals." *Reno*, 525 U.S. at 491.

The Order is also religion-neutral on its face. It draws no "explicit and deliberate distinctions" based on religion, *Larson v. Valente*, 456 U.S. 228, 246 n.23 (1982), and indeed, does not mention religion at all. For this reason, even if the Order was not in the immigration context, plaintiffs would need very strong evidence of purpose to overcome the stated secular purpose. *Id.* And in the immigration context, courts may not "look behind the exercise of [Executive] discretion" taken "on the basis of a facially legitimate and bona fide reason." *Mandel*, 408 U.S. at 770; *accord Fiallo*, 430 U.S. at 795 (confirming that a broad "policy choice" is to be reviewed under the same "standard … applied in [] *Mandel*"); *accord Bustamante v. Mukasey*, 531 F.3d 1059, 1062 n.1 (9th Cir. 2008) ("We are unable to distinguish *Mandel* on the grounds that . . . the reasoning or outcome would vary according to which executive officer is exercising the Congressionally-delegated power to exclude"). The Fourth Circuit has affirmed this principle, explaining that "[t]he reasons that preclude judicial review of political

questions also dictate a narrow standard of review of decisions made by the Congress or the President in the area of immigration and naturalization." *Appiah*, 202 F.3d at 710; *see Rajah*, 544 F.3d 438 ("[t]he most exacting level of scrutiny that we will impose on immigration legislation is rational basis review").

Plaintiffs rely on cases far removed from the immigration context, such as "disparate impact" cases applying equal protection principles. But it is an "unreasoned assumption that courts should simply plop Establishment Clause cases from the domestic context over to the foreign affairs context; [that] ignores the realities of our world." *9th Cir. Mar. 15 Dissent* at n.6. And in any event, even outside the immigration context, the Order's stated purpose would be entitled to "deference" so long as it is "genuine," *i.e.,* "not a sham, and not merely secondary to a religious objective." *McCreary*, 545 U.S. at 864. Courts judge the genuineness of the government's true "object" by considering the "operation" of its action, as "the effect of a law in its real operation is strong evidence of its object." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 535 (1993). Here, the effect of the law is, consistent with its stated purpose and the evidence about the activities of terrorist organizations and the risks posed by nationals of the particular countries in § 1 (along with refugee admissions in general), to temporarily suspend admissions from nationals of six countries (along with refugees worldwide) irrespective of any covered alien's religion (including millions of non-Muslim individuals).

Plaintiffs repeatedly note that the six countries covered by the entry suspension are "predominantly Muslim," and assert that this creates an allegedly-improper "disparate impact." Mot. 3, 4, 20, 22-23. But Iraq is also a predominantly Muslim country covered by the Revoked Order, and it has been excluded from the temporary suspensions on travel in this Order because "since [E.O.] 13769 was issued, the Iraqi government has expressly undertaken steps to enhance travel documentation, information sharing, and the return of Iraq nationals subject to final orders of removal." Order § 1(g). The treatment of Iraq highlights that the Order is tailored not to religion, but to national security risk and other countries' cooperation efforts.

The six remaining countries covered were previously selected by Congress and the Executive through a process that Plaintiffs do not contend was religiously motivated. Moreover, Plaintiffs do not dispute the presence of al-Qaida and Islamic State and their affiliates in all six countries; the designation of Iran, Sudan, and Syria as state sponsors of terrorism; and the "significant compromise[] by terrorist organizations" or "active conflict zones" associated with each country. Order §§ 1(d), (e). The *IRAP* court recognized these national security interests, and declined to "second-guess the conclusion that" the Order advances these interests. *See IRAP* at 35. And significantly, the court in *Aziz* did not have the opportunity to consider the country-specific material set forth in Section 1 of the Order because no such information was presented in the Revoked Order. *See Aziz*, 2017 WL 580855 at *9 (relying on the "dearth of evidence" regarding national security in the record).[22] This evidence is sufficient: in the immigration context, the only "question is whether the [law] is supported by a rational basis." *Johnson v. Whitehead*, 647 F.3d 120, 127 (4th Cir 2011).

**b. The Order cannot be restrained on the basis of campaign statements.**

Plaintiffs argue that the Order targets Islam not because of what it says or does, but because statements made "at various times during the presidential campaign" that plaintiffs claim reflect "the general views of Defendant Trump," and inferences they claim can be drawn from broad political statements made by various advisors, constitute an allegedly unlawful "sequence of events" leading to the Order. Mot. at 16-18 (quoting *Edwards v. Aguillard*, 482 U.S. 578, 594-95 (1987)). But even if the Court could properly look behind the Order's "facially legitimate and bona fide" national security purpose (and it cannot, *Mandel*, 408 U.S. at 77), informal statements by the President or his surrogates

[22] Without explanation, the *Hawaii* court ignored §1 of the Order except to quote from, without relying on, plaintiffs' allegations that portions of § 1 improperly relate to terrorism convictions of Iraqi nationals who are no longer covered by the Order. But the Order itself explains why Iraq, one of the seven countries covered by the Revoked Order, is no longer covered: in the interim, "the Iraqi government has expressly undertaken steps to enhance travel documentation, information sharing, and the return of Iraqi nationals subject to final orders of removal." Order § 1(g). Given the desire by plaintiffs here for "justification" of the adoption of the new Order, the inclusion of this information cannot reasonably support a finding of pretext.

that do not directly concern the Order are irrelevant. "Establishment Clause analysis does not look to the veiled psyche of government officers," but rather to "the text, legislative history, and implementation of the statute, or comparable official act." *McCreary*, 545 U.S. at 862-63. Contrary to plaintiffs' suggestion, *Edwards* focused on what was "clear from the legislative history," not analysis of the legislators' psyche or statements in their pre-official capacity. 482 U.S. 590-93. Statements by private persons cannot reveal the *government's* purpose or "object." *McCreary*, 545 U.S. at 859-60; *see Glassman v. Arlington Cty*, 628 F.3d 140, 147(4th Cir. 2010). Indeed, the Supreme Court has declined to rely even on press statements and other informal communications by incumbent government officials, recognizing that they may not accurately reflect the government's position. *See Hamdan v. Rumsfeld*, 548 U.S. 557, 624 n.52 (2006); *Professionals & Patients… v. Shalala*, 56 F.3d 592, 599 (5th Cir. 1995).

Using comments by political candidates to question the stated purpose of later action is particularly problematic. Candidates are not government actors, and statements of what they might attempt to achieve if elected, which are often simplified and imprecise, are not "official act[s]." *McCreary*, 545 U.S. at 862. They generally are made without the benefit of advice from an as-yet-unformed Administration, and cannot bind elected officials who later conclude that a different course is warranted. *See Repub. Pty. of Minn. v. White*, 536 U.S. 765, 780 (2002). Permitting campaign statements to contradict official pronouncements of the government's objectives would inevitably "chill political debate during campaigns."[23] *Phelps v. Hamilton*, 59 F.3d 1058, 1068 (10th Cir. 1995) (declining to rely on campaign statements). It also would be unworkable, requiring the "judicial psychoanalysis" that

[23] The interpretation by the Court in *IRAP* that *Glassroth v. Moore*, 335 F.3d 1282 (11th Cir. 2003) authorizes reliance on campaign statements overreads the discussion in *Glassroth*: although describing the campaign history and the district court's reliance on it, the 11th Circuit declined to rest its "de novo" review of the district court on those statements, instead citing the judge's trial testimony explicitly acknowledging a religious purpose. *Id.* at 1297 (relying on "his testimony when he said that the monument 'reflects the sovereignty of GOD over the affairs of men'"). In addition, in contrast to the private-citizen status of the presidential candidate at the time of statements here, the judge in *Glassroth* was already a lower court judge at the time of the campaign. *Id.* at 1284-85.

*McCreary* repudiated. 545 U.S. at 862. And contrary to the opinion in *Aziz*, there is ample precedent supporting the fact that the oath to the Constitution taken by the President and other public officers at entry into the office *does* meaningfully alter those officials' relationships to the Constitution.[24] *Cf. Printz v. U.S.*, 521 U.S. 898 (1997); *Williams-Yulee v. Fla. Bar*, 135 S. Ct. 1656, 1666 (2015).

Even considering plaintiffs' proffered extrinsic evidence, none of it demonstrates that this Order—adopted after the President took office, to address the Ninth Circuit's concerns—was driven by religious animus.[25] The Order is not a "complete shutdown" on Muslims entering the country, Mot. 2, or even from the six countries named, nor is it limited to Muslim-majority countries given that it temporarily suspends the Refugee Program globally. There is a complete disconnect between plaintiffs' imputed purpose and the Order's actual effect.[26]

Plaintiffs cite *McCreary* to argue for looking behind the Order's text and legal effects to speculate at its aims. In fact, *McCreary* says the opposite. *McCreary* makes clear that what matters is not a government official's subjective motive, but only the "official objective" drawn from "readily discoverable fact." 545 U.S. at 862. As *McCreary* explained, the Supreme Court's previous cases had

[24] Significantly the only post-inauguration statement by the President on which the Court relied in *Aziz* related to the religious refugee provision not in the Order. *See Aziz* at *4-*5, *8; *supra* n.6.

[25] Plaintiffs suggest the Order should be analyzed no differently than the Revoked Order because it "maintains . . . the part that prohibits nonimmigrant, nonresident" persons from the six countries, Mot. at 6—which ignores the waiver provisions and other modifications—is flawed. It is not "an attempt to 'evade' the injunction" when the Government changes "a policy . . . in order to resolve a specific controversy," even if that new policy maintains aspects of the old. *Salazar v. Buono*, 559 U.S. 700, 717 (2010). As another judge of this Court noted in *Aziz*, the President's campaign statements do not "render every policy that the president makes related to Muslim majority countries open to challenge," *Aziz*, 2017 WL 580855 at *9, including the Order, directed as it is only at persons abroad who have not been determined admissible to the United States. Here, the Order explains both its purpose of suspending entry during the period of a review of admissions procedures and that its provisions respond to concerns raised by courts, there is thus no basis to suggest that an "abnormal policy evolution" has occurred that cannot be explained. Mot. at 25.

[26] Plaintiffs make much of the fact that this Order is under-inclusive because it does not apply to foreign countries from which they allege other Muslim terrorists or their families originated. Mot. at 10-12. But the fact that the Order applies to countries identified by the previous Administration and Congress is hardly evidence of animus.

rested on analysis of objective facts directly related to the law at issue. *See id.* at 862-63 ("In each case, the government's action was held unconstitutional only because openly available data," related to "official act[s]"—"supported a commonsense conclusion that a religious objective permeated the government's action"); *see Lukumi*, 508 U.S. at 534-35 (gleaning purpose from ordinances' "text" and "operation"). *McCreary's* analysis of the counties' purpose therefore centered on the text of the resolutions that serially authorized Ten Commandments displays and the displays themselves, and the Court emphatically rejected suggestions that it "look to the veiled psyche of government officers." 545 U.S. at 863. Importantly, the counties' final display still showed a "sectarian spirit," since it "quoted more of the purely religious language [of the Commandments]… than the first two displays had done," and, significantly, was created "without a new resolution or repeal of the old one." *Id.* at 870, 872.

This case contrasts starkly with *McCreary*, but even applying *McCreary*, the Tenth Circuit has described a standard for "curative actions" where a court is concerned that a prior official action had an improper purpose, and that standard is met here. *See Felix v. City of Bloomfield*, 841 F.3d 848, 863 (10th Cir. 2016). Curative actions should be "(1) purposeful, (2) public, and (3) at least as persuasive as the initial endorsement of religion." *Id.* Here, the Order explicitly states that it is not issued for religious purposes, and instead describes its national security purposes. *Compare id.* at 864 *with* Order §§ 1(b)-(i). The Order is highly public; its evidence of secular purpose is stated in its text and not "difficult-to-access." *Felix*, 841 F.3d 863. The Order removed the only explicitly religious element in the Revoked Order, *supra* n.6. And given the particular deference to Executive determinations in the national security context, *see, e.g.*, *Holder v. Humanit. Law Project (HLP)*, 561 U.S. 1, 34 (2010), the Order's description of the national security concerns animating its purpose should be treated as persuasive by the Court.[27] In short, the President's efforts to accommodate courts' concerns while also fulfilling his

[27] Relevantly, the Order also reflects the considered views of the Secretary of State, the Secretary of Homeland Security, and the Attorney General, who announced the Order. Contrary to the view of the *IRAP* court, *see IRAP*, 2017 WL 1018235 at *15, the fact that the formal document stating these views issued "the same day" as the Order does not render those views suspect.

constitutional duty to protect the Nation is permissible evidence of intent is not to discriminate along religious lines. *See Children's Health… v. Min de Parle*, 212 F.3d 1084 (8th Cir. 2000) (upholding facially neutral, post-invalidation, reenactment).

**III. The Balance of Equities and Public Interest Weigh Strongly Against Injunctive Relief.**

The balance of the equities and the public's interest—which merge here, *see Nken v. Holder*, 556 U.S. 418, 435 (2009)—counsel strongly in favor of leaving the Order in effect. The President, in consultation with members of his Cabinet, determined that, during the review of screening and vetting procedures, the "risk of erroneously permitting entry" of an individual who intends to commit terrorist acts "is unacceptably high." Order §1(f). That risk assessment provides more than sufficient basis to leave the Order's temporary, precautionary safeguards in place.

"Courts have accorded great weight to considerations of national security when balancing the interests and equities of the parties." *Nat'l Res. Def. Council, Inc. v. Pena*, 972 F. Supp. 9, 20 (D.D.C. 1997); *see also Winter*, 555 U.S. at 24; *Comm. for Nuclear Responsibility, Inc. v. Seaborg*, 463 F.2d 796, 798 (D.C. Cir. 1971) (because of "assertions of potential harm to national security and foreign policy—assertions which [the court] obviously can not appraise—…we are constrained to refuse an injunction" on a limited record). "[T]he Supreme Court has long acknowledged that 'no governmental interest is more compelling than the security of the Nation.'" *U.S. v. Abu Ali*, 528 F.3d 210, 240 (4th Cir. 2008) (quoting *Haig v. Agee*, 453 U.S. 280, 307 (1981)). "The continuing threat of international terrorism highlights [that] the 'government has no more profound responsibility than the protection of Americans … against additional unprovoked attack.'" *Abu Ali*, 528 F.3d at 240.

Notably, the Order describes data showing that some 300 persons who entered as refugees are currently under investigation, and hundreds of foreign-born persons have been convicted of terrorism-related crimes. Order §1(h). Given that reality, the Executive's obligation and the Order's aim and scope is based on the Executive's "[p]redictive judgment" where the greatest risk exists *going*

*forward*, an assessment which is entitled to the greatest possible degree of judicial deference. *Dep't of Navy v. Egan*, 484 U.S. 518, 527-29 (1988). Such judgments "have long been held to belong in the domain of political power not subject to judicial intrusion or inquiry," as they "are delicate, complex, and involve large elements of prophecy . . . for which the Judiciary has neither aptitude, facilities nor responsibility." *Chi. & S. Air Lines v. Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948). "[W]hen it comes to collecting evidence and drawing factual inferences in this area, the lack of competence on the part of the courts is marked, and respect for the Government's conclusions is appropriate." *HLP*, 561 U.S. at 34.

The "evaluation of the facts by the Executive" to support predictive judgments is especially "entitled to deference" when "*litigation* implicates sensitive and weighty interest of national security and foreign affairs." *HLP*, 561 U.S. at 33-35 (emphasis added). When the Executive adopts "a preventive measure … to prevent imminent harms in the context of international affairs and national security," the government "is not required to conclusively link all the pieces in the puzzle before we grant weight to its empirical conclusions." *Id.* at 35. Thus, where "[t]he Executive … deem[s] nationals of a particular country a special threat," "a court would be ill equipped to determine the[] authenticity and utterly unable to assess the[] adequacy" of that determination. *Reno*, 525 U.S. at 491. Here, the Order's objective is to prevent future terrorist attacks before they occur, and the Order properly focuses on six countries that the President, and the Congress, and the prior Administration determined pose the greatest risk of terrorist entry in the future. *See also Rajah*, 544 F.3d 433, 439 & n.3 (upholding against "improper [religious] animus" challenge program that first applied to five of the same six countries: Iran, Iraq, Libya, Sudan, and Syria).

**IV. The Facial Sweeping Relief Sought is Unwarranted.**

"An injunction 'should be tailored to restrain no more than what is reasonably required to accomplish its ends.'" *Hayes v. N. State Law Enf't.. Officers Ass'n*, 10 F.3d 207, 217 (4th Cir. 1993).

"Particularly is this so when preliminary relief, on something less than a full record and full resolution of the facts, is granted." *Consol. Coal Co. v. Disabled Miners of S. W. Va.*, 442 F.2d 1261, 1267 (4th Cir. 1971). The emergency relief requested—enjoining the Order in its entirety—is plainly overbroad.

First, Plaintiffs can only plausibly attempt to show harms stemming from the Order's provisions suspending entry of certain foreign nationals from the six countries. To the extent any of those claimed harms are cognizable and irreparable, harms rooted in those particular provisions do not support enjoining the Order in its entirety. Second, Plaintiffs cannot carry the required burden for a facial challenge of "establish[ing] that no set of circumstances exist under which the [Order] would be valid," *Salerno*, 481 U.S. at 745. Accordingly, even if the Court were to grant any emergency relief, it should be strictly limited to only what is necessary to prevent irreparable injuries to Plaintiffs themselves, because "equity requires that injunctions be carefully tailored." *Ga.-Pac. Consumer Prod. LP v. von Drehle Corp.*, 781 F.3d 710, 715 (4th Cir. 2015). Applying that principle, the Fourth Circuit has repeatedly vacated injunctions that reach beyond the minimum scope necessary to redress the plaintiff's specific harm pending further proceedings. *See, e.g., Kentuckians for Commonwealth v. Rivenburgh*, 317 F.3d 425, 436 (4th Cir. 2003); *Ga.-Pac.*, 781 F.3d at 716-17. For the claims related to others' visa applications, an injunction could address, at most, those applicants' visa applications.[28]

**CONCLUSION**

For the reasons set forth above, the Court should deny plaintiffs' motion.

[28] Plaintiffs also do not demonstrate the need for a nationwide injunction. While "[n]ationwide injunctions may issue if necessary to afford relief to the prevailing party," relief must be no broader than necessary to avoid limiting "the ability of other circuits to consider the questions." *Aziz*, 2017 WL 580855 at *10.

Dated: March 17, 2017

Respectfully submitted,

DANA J. BOENTE
United States Attorney

CHAD READLER
Acting Assistant Attorney General
Civil Division

JENNIFER D. RICKETTS
Director, Federal Programs Branch

JOHN R. TYLER
Assistant Director, Federal Programs Branch

By: ____/s/_________________
DENNIS C. BARGHAAN, JR.
Assistant U.S. Attorney
2100 Jamieson Avenue
Alexandria, Virginia 22314
Telephone: (703) 299-3891
Fax: (703) 299-3983
Email: dennis.barghaan@usdoj.gov

ERIC J. SOSKIN
BRAD P. ROSENBERG
ARJUN GARG
MICHELLE R. BENNETT
DANIEL SCHWEI

Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch

ATTORNEYS FOR DEFENDANTS

**CERTIFICATE OF SERVICE**

I hereby certify that on this date, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will transmit a true and correct copy of the same to the following:

Gadeir Ibrahim Abbas
The Law Office of Gadeir Abbas
1155 F Street, N.W., Suite 1050
Washington, D.C. 20004
Email: Gadeir@abbaslawfirm.com

Dated: March 17, 2017

/s/________________

DENNIS C. BARGHAAN, JR.
Assistant U.S. Attorney
2100 Jamieson Avenue
Alexandria, Virginia 22314
Telephone: (703) 299-3891
Fax: (703) 299-3983
Email: dennis.barghaan@usdoj.gov

ATTORNEYS FOR DEFENDANTS